UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HAMMON PLATING CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>GALEN O. WOOTEN, et al.,<br><br>Defendant. | Case No. 16-CV-03951-LHK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 71 |

Plaintiff Hammon Plating Corporation ("Hammon Plating") sues Defendant Galen Wooten, personal representative of the estate of Thomas Wooten ("Wooten"), for breach of contract, fraud, and breach of the implied covenant of good faith and fair dealing. Before the Court is Wooten's motion for partial summary judgment. ECF No. 71. Having considered the parties' briefing, the relevant law, and the record in this case, the Court hereby GRANTS in part and DENIES in part Wooten's motion for partial summary judgment.

## I.    BACKGROUND

### A.    Factual Background

Thomas Wooten was the owner of Hammon Plating, a business located in Palo Alto,

California that specializes in the electroplating ("plating") of metal components for industrial use. ECF No. 71-1 ("Rapoport Aff."), ¶ 2. Thomas Wooten suffered from cancer and, in 2014, Thomas Wooten executed a Limited Durable Power of Attorney that granted William R. Rapoport ("Rapoport") the authority to manage the business affairs of Hammon Plating. *Id.*; *see also id.* Ex. A.

On June 19, 2014, Rapoport executed a Letter of Intent to sell all of Wooten's shares in Hammon Plating to Esperer Holdings, LLC ("Esperer Holdings"), or its nominee, for approximately $20 million. *Id.* ¶ 3; *see also id.* Ex. B. The Letter of Intent was subject to a due-diligence investigation into the financial affairs of Hammon Plating. *Id.* Rapoport began the due diligence process with Esperer Holdings. *Id.* ¶ 4. Wade Smith ("Smith") and Steve Sorenson ("Sorenson") were the representatives of Esperer Holdings during the due diligence process. Esperer Holdings' counsel during the due diligence process was Ballard Spahr LLP ("Ballard Spahr"). *Id.*

Because of issues discovered during the due diligence process, which are discussed further below, the sale price was reduced from the initial price of approximately $20 million to a final sale price of $9.339 million. Rapoport Aff. ¶ 21. The final Stock Purchase Agreement ("Agreement") was executed on February 18, 2015. *Id.* ¶ 11. Esperer Holdings chose AMC Acquisition Corporation ("AMC") as its nominee to buy Hammon Plating. *Id.* The Agreement provided that AMC would pay Wooten $9.339 million for Wooten's stock in Hammon Plating. *Id.*

Four issues with the Agreement are the subject of the instant dispute: an environmental issue, an occupancy permit issue, an ERISA issue, and a subordination issue. The Court discusses each of these below.

**1. Environmental Issue**

Hammon Plating holds title to two Palo Alto properties, 855 Commercial Street and 882 Commercial Street, and leases a third Palo Alto property at 890 Commercial Street. *Id.* ¶ 5. During the due diligence process, Rapoport disclosed to Esperer Holdings that Hammon Plating

United States District Court
Northern District of California

had voluntarily entered into a Facility-Initiated Corrective Action Agreement ("FICA Agreement") with the California Department of Toxic Substances Control ("DTSC") with regards to Hammon Plating's three properties. *Id.*; *see also id.* Ex. D ("FICA Agreement"). The FICA Agreement concerned the contamination of Hammon Plating's properties by chemical solvents known as "PCE" and "TCE," which are used during the plating process. *Id.* ¶ 5. The FICA Agreement required Hammon Plating to cooperate with DTSC in the assessment of the contamination, and required Hammon Plating to complete environmental remediation efforts upon approval by the DTSC. *Id.* Further, under the FICA Agreement, Hammon Plating was required to pay for the contamination assessment and environmental remediation efforts. *Id.*

An environmental consultant, Green Environment, Inc. ("Green Environment"), was retained to assist Hammon Plating in complying with the FICA Agreement and completing the environmental remediation efforts. *Id.*

Rapoport disclosed to Esperer Holdings during the due diligence process all of the above facts concerning the environmental contamination and FICA Agreement, and Rapoport provided regular updates to Esperer Holdings about the ongoing process with the DTSC. *Id.* ¶ 5–7. As a result of Rapoport's disclosures, Esperer Holdings retained their own environmental consultant, Enviro-Assessment, P.C. ("Enviro-Assessment"), to conduct an independent environmental assessment of Hammon Plating's three properties. *Id.* ¶ 6; *see also* ECF No. 71-1 ("Sorenson Dep."), at 69 (explaining that Esperer Holdings retained Enviro-Assessment as part of the Esperer Holding's due diligence investigation). Enviro-Assessment submitted an independent report to Esperer Holdings on November 20, 2014, which Esperer Holdings reviewed before the Agreement closed. *See id.* Ex. E; Sorenson Dep., at 68–69. Sorenson does not recall whether Enviro-Assessment prepared for Esperer Holdings an estimate of the environmental clean-up costs. However, Sorenson stated that nothing prevented Esperer Holdings from requesting a cost estimate from Enviro-Assessment. Sorenson Dep. at 105.

Rapoport discussed with Green Environment the anticipated costs of the environmental

3

remediation efforts. Rapoport Aff. ¶ 8. Green Environment told Rapoport that a "concrete estimation of [the environmental remediation] costs was challenging since the DTSC had not at that point approved a definitive remediation plan." *Id.* On November 14, 2014, Rapoport emailed Smith and Esperer Holdings and told Smith that a "ballpark figure" for the costs of the remediation efforts "may range anywhere from $150,000.00 to $250,000.00." *Id.* Ex. G. In addition, there would be approximately $58,000 in fees due to the DTSC. *Id.* Similarly, in December 2014, Glenn Phinney ("Phinney"), the president of Hammon Plating, told Esperer Holdings that the $200,000.00 clean up cost estimate was a "rough estimate" that was "based on some conversations with the environmental consultant." *Id.*; Ex. H.

As a result of the parties' discussions of the environmental issues at Hammon Plating's facilities, drafts of the Agreement that were exchanged in December 2014 "included provisions which were intended to address the risks of the disclosed environmental contamination." *Id.* ¶ 9. A draft of the Agreement circulated on December 16, 2014, included ¶ 1.2(a)(ii), which was drafted by Ballard Spahr. Paragraph 1.2(a)(ii) required Wooten to deposit

> (ii) an amount of cash placed in an escrow account equal to $300,000 to cover the anticipated cost of [environmental] remediation for the Environmental Claims that are outstanding as of the Closing Date, provided that the Buyer shall pay the Seller any remaining balance of such funds after such remediation has been completed.

*Id.* ¶ 9; *see also id.* Ex. I, at ¶ 1.2(a)(ii). Similarly, ¶ 1.3(f) of the December 16, 2014 draft Agreement included the following paragraph, which was also drafted by Ballard Spahr:

> (f) *Environmental Remediation Adjustment*. If the aggregate cost of remediation for the Environmental Claims that are outstanding as of the Closing Date exceeds $300,000, the outstanding principal amount of the Promissory Note shall be reduced by the amount of the additional cost for such remediation.

*Id.* ¶ 10; *see also id* Ex. I, at ¶ 1.3(f).

Sorenson explained that the $300,000 escrow amount in ¶¶ 1.2 and 1.3 was calculated from the "150 and $200,000" clean-up cost estimate provided by Green Environment, in addition to "an extra hundred thousand bucks to cushion it." Sorenson Dep., at 67. Sorenson stated that "all

4

[parties] agreed there was uncertainty" about the cost of the environmental remediation efforts. *Id.* at 102. Smith also testified that the environmental remediation costs were "an unknown variable" at the time of the Agreement. ECF No. 71-1 ("Smith Dep."), at 120.

As stated above, the final version of the Agreement was signed on February 18, 2015 and called for AMC to pay a total of $9.339 million for Wooten's stock in Hammon Plating. Rapoport Aff. ¶ 11. AMC was to pay $ 2 million in cash at closing and, after the completion of financing, a post-closing down payment. *Id.* The remaining balance would be paid in annual installments pursuant to the terms of a promissory note in the face amount of $3.839 million, which was guaranteed by Esperer Holdings and subject to adjustments. *Id.* As relevant here, the final version of the Agreement contained ¶¶ 1.2(b) and 1.3(f), which provided for adjustments in the promissory note related to the environmental remediation costs.

Specifically, under ¶ 1.2(b) of the Agreement:

> (b) The Seller shall provide, prior to closing, an amount of cash placed in an escrow account equal to $300,000 to cover the anticipated cost of [environmental] remediation for the Environmental Claims that are outstanding as of the Closing Date, provided that the Buyer shall pay the Seller any remaining balance of such funds after such [environmental] remediation has been completed. Any amount above and beyond $300,000 that the [environmental] remediation costs, shall be deducted from the final installment payment under the Promissory Note.

*Id.* ¶ 12; *see id.* Ex. J, at ¶ 1.2(b).

Similarly, under ¶ 1.3(f) of the Agreement:

> (f) *Environmental Remediation Adjustment*. If the aggregate cost of [environmental] remediation for the Environmental Claims that are outstanding as of the Closing Date exceeds $300,000, the outstanding principal amount of the Promissory Note shall be reduced by the amount of the additional cost for such [environmental] remediation.

*Id.* ¶ 12; *see id.* Ex. J, at ¶ 1.3(f). The Agreement defines "Environmental Claims" as any action "by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries,

5

medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence, Release of, or exposure to, any Hazardous Materials; or (ii) any actual or alleged grounds for liability under any Environmental Law or term or condition of any Environmental permit." *Id.* Ex. C.

The final version of the Agreement also contained certain warranties that Hammon Plating's properties were in compliance with applicable laws and regulations. *See id.* ¶ 3.12(e). The final version of the Agreement exempted from these warranties the "DTSC issue that is already identified and being addressed." *Id.*

According to Rapoport, he understood the Agreement's provisions regarding the environmental remediation costs to mean that Wooten "would be responsible for the first $300,000 of the environmental remediation costs; that [Hammon Plating] would then pay any amount in excess of $300,000 necessary to complete the environmental remediation; and that the principal amount due to [Wooten] under the $3.839 million Promissory Note would be reduced dollar for dollar for any amounts in excess of $300,000 expended by [Hammon Plating] to complete the environmental remediation." *Id.* ¶ 13.

Sorenson testified during his deposition that his understanding of the Agreement was the same as Rapoport's:

> Q: "[T]he sellers would put up $300,000 in an escrow account to cover environmental remediation; is that correct?
>
> A [Sorenson]: Right.
>
> Q: "If the amount exceeded that, the cost in excess of $300,000 would be deducted from the promissory note that had been given to them; is that right?
>
> A; It could be.
>
> Q: That would reduce the amount due to them under the promissory note?
>
> A: Right.
>
> Q. Didn't that assume that the costs for that remediation in excess of $300,000 would be paid by your side of the equation and that's why

6

United States District Court
Northern District of California

> you would be entitled to a reduction in the promissory note?
> . . .
>
> A: Yeah. I mean, I think that's a fair characterization of the way the deal was supposed to work.

Sorenson Dep. at 86.; *see also id.* at 104.

After the close of the Agreement, Rapoport organized a meeting between Green Environment and the new owners of Hammon Plating. Rapoport Aff. ¶ 14. In March 2015, Green Environment stated that the anticipated expense of the environmental remediation costs was expected to exceed $300,000 because of requirements imposed by DTSC. *Id.* The parties still do not know the total cost of the environmental remediation efforts.

### 2. Occupancy Permit Issue

In addition to the environmental remediation issue discussed above, the parties also discussed during the due diligence process an issue regarding occupancy permits for Hammon Plating's location at 882 Commercial Street in Palo Alto.

Specifically, in January 2015, Rapoport learned that, even though the 882 Commercial Street location had been in active use for years and annually inspected by the Palo Alto Fire Department, Hammon Plating did not have an occupancy permit for 882 Commercial Street. *Id.* ¶ 15. Rapoport shared this information with Sorenson and Smith. *Id.*

On February 16, 2015, Rapoport had a telephone conversation with Sorenson regarding the lack of an occupancy permit for 882 Commercial Street. Rapoport memorialized the content of this telephone conversation in a memorandum prepared on February 17, 2015. *See id.* Ex. M. According to Rapoport's affidavit and the memorandum of the phone conversation, Rapoport informed Sorenson that, from Rapoport's perspective, there were three potential solutions to the lack of an occupancy permit at 882 Commercial Street. First, the City of Palo Alto might find that Hammon Plating "had grandfathered rights based on its years of use of the property and annual inspections." *Id.* ¶ 16; *see also id.* Ex. M. Second, the City of Palo Alto might require that 882 Commercial Street "be brought up to the current building codes" before the city would issue an occupancy permit. *Id.* ¶ 16; *see also id.* Ex. M. Third, the City of Palo Alto might consider that,

7

since 882 Commercial Street did not have an occupancy permit, Hammon Plating was "applying for a new permit for metal *plating*," which the City of Palo Alto had already declared it would no longer issue. *Id.*¶ 16 (emphasis added); *see also* Ex. M. According to Rapoport's affidavit and memorandum, Sorenson believed that the most likely outcome was the first or second option, and thus Sorenson wished to sign the Agreement. *Id.* ¶ 16; *see also* Ex. M. Sorenson does not deny that the February 16, 2015 telephone conversation with Rapoport occurred. *See* Sorenson Dep. at 90. Sorenson stated in his deposition that he does not recall the contents of the telephone conversation. *Id.*

Until the issue regarding the occupancy permit arose, drafts of the Agreement included representations and warranties in ¶ 3.12 that the real property being conveyed was in compliance with all applicable governmental regulations. Rapoport Aff. ¶ 17. However, "negotiated language was added to the signed, final version of" the Agreement that exempted the occupancy permit issue for 882 Commercial Street from the Agreement's warranties. *Id.*

Specifically, the final version of the Agreement contains the following language at ¶ 3.12(e):

> (e) As of the date of this Agreement . . . neither the Company, any of its Subsidiaries, nor the Seller has received written notice, and to the Knowledge of the Seller, no other notice, from any Governmental Authority that the Real Property or the present use of the Real Property fails to comply with any applicable Laws, Governmental Orders, Permits or restrictions of any Governmental Authority having jurisdiction over any portion of the Real Property. **This clause does not include . . . the occupancy permit issue on 882 Commercial St.**

*Id.* ¶ 3.12(e) (emphasis added).

Similarly, although drafts of the Agreement contained representations and warranties that the real property being conveyed was not subject to environmental or land use issues, the final version of the Agreement contained the following language at ¶ 3.12(f):

> (f) As of the date of this Agreement, there are no pending or, to the Knowledge of the Seller, threatened condemnation, fire, health, safety, environmental, building, zoning, land use or other Actions relating to any portion of the Real Property that, if successful, would

8

> adversely affect the current use or occupancy thereof, nor has the Company or the Seller received written notice, or to the Knowledge of the Seller, any other notice, of any pending or threatened special assessment proceedings affecting any portion of the Real Property. **This clause does not include** . . . **the occupancy permit issue on 882 Commercial St.**

*Id.* ¶ 3.12(f) (emphasis added).

After the Agreement closed on February 18, 2015, Esperer Holdings engaged Rapoport to assist Esperer Holdings in securing an occupancy permit for 882 Commercial Street. *See* Rapoport Aff. ¶ 19. The City of Palo Alto signed off on a temporary certificate of occupancy for 882 Commercial Street on February 20, 2015. *Id.*; *see also id.* Ex. N. Rapoport informed Esperer Holdings that, in order to secure a permanent certificate of occupancy, Esperer Holdings would need to "reinstall mechanical equipment such as air scrubbers and ventilation ductwork used in the plating process, which was then in storage," and "pass an inspection by the Palo Alto Fire Department." *Id.*

Smith hired a company to reinstall the equipment and ventilation ducts at 882 Commercial Street. *See* Smith Dep. at 116. The Palo Alto Fire Department performed a final inspection, which the 882 Commercial Street building passed. The City of Palo Alto issued a permanent occupancy permit for 882 Commercial Street. *Id.* at 117.

Smith subsequently attempted to obtain a plating permit for the 882 Commercial Street building. *Id.* at 118. However, the Palo Alto Fire Department would not provide a plating permit for 882 Commercial Street because the Palo Alto Fire Department would no longer allow "wet floors," which are required for plating operations. *Id.* at 118–19. Hammon Plating has a plating permit for its building at 890 Commercial Street because that building's plating permit has grandfathered rights to have "wet floors." *Id.* at 119.

According to Rapoport, the reduction of the purchase price from the $20 million total purchase price listed in the original Letter of Intent to the final purchase price of $9,393,000 reflected the disclosed risks during the due diligence process, including the environmental issues and the occupancy permitting issues. *See* Rapoport Aff. ¶ 21.

### 3. Pension Plan Issue

The final Agreement also included provisions that the Hammon Plating Corporation Profit Sharing Plan ("Profit Sharing Plan") was in compliance with the Employee Retirement Income Security Act ("ERISA") and accompanying regulations. *Id.* ¶ 22.

Shortly after the Agreement closed, Rapoport retained Trucker Huss, a San Francisco law firm that specializes in ERISA compliance issues, to advise Wooten respecting the closing down of Hammon Plating's Profit Sharing Plan. *Id.* ¶ 23. Rapoport shipped boxes of Hammon Plating's pension plan records to Trucker Huss. *Id.*

Trucker Huss informed Rapoport that there were ERISA compliance issues regarding the Profit Sharing Plan. *Id.* On December 7, 2015, Trucker Huss reported these concerns to counsel for Esperer Holdings. *Id.*; *see id.* Ex. P. Trucker Huss proposed that Hammon Plating enter into a voluntary closing agreement with the Internal Revenue Service. *Id.*

According to Rapoport, he had no knowledge of the ERISA compliance issues prior to being told about the problem by Trucker Huss after the closing of the Agreement. *Id.* ¶ 24. During his deposition, Smith testified that he had "no idea" whether there were any misrepresentations by Rapoport or other Wooten representatives regarding the Profit Sharing Plan's compliance with ERISA. *See* Smith Dep. at 153. According to Smith, he understood that the parties had questions about the Profit Sharing Plan prior to the closing of the Agreement, but Smith understood that those issues "were too complex to iron out before the [Agreement] closed." *Id.* at 154.

### 4. Proposed Subordination

The Agreement contained several provisions relating to how the $9,339,000 aggregate purchase price was to be paid. *See* Agreement ¶ 1.2. In addition to the payment of cash at the closing of the Agreement and the execution of a promissory note, the Agreement provided that "[a]fter the closing [of the Agreement] and upon completion of the Buyer's financing, the Buyer will pay" a "Post Closing Down Payment" to Wooten. *Id.* ¶ 1.2(d).

According to Hammon Plating, Hammon Plating attempted to obtain financing as contemplated in the Agreement. *See* Compl. ¶ 17. Hammon Plating "was able to obtain financing contingent on [Wooten] signing a subordination agreement which [Wooten] refused to sign." *Id.* ¶ 18. Hammon Plating states that Wooten's refusal to sign the subordination agreement has prevented Hammon Plating from obtaining financing, and thus completing the payments as intended by the Agreement. *Id.*

Rapoport states that the subordination issue "surfaced long after the closing of the [Agreement]." Rapoport Aff. ¶ 25. Further, Rapoport was not Galen Wooten's attorney regarding the subordination issue, but rather Galen Wooten "was separately represented with regard to this issue." *Id.* However, Rapoport attests that during the course of negotiating the Agreement, Rapoport insisted to Esperer Holdings that Thomas Wooten's "indebtedness be secured in first position." *Id.*

## B. Procedural History

On June 6, 2016, Hammon Plating sued Wooten in California state court. Hammon Plating alleged three state law claims against Wooten: (1) breach of contract; (2) fraud; and (3) breach of the implied covenant of good faith and fair dealing. ECF No. 1-1 ("Compl."). Hammon Plating sought to recover damages and restitution for the down payment made to Wooten. *Id.*

On July 13, 2016, Wooten removed the case to this Court on the basis of diversity jurisdiction. ECF No. 1.

On August 5, 2016, Wooten answered the complaint, and also asserted counterclaims and a third-party complaint against Hammon Plating and third-party Defendants AMC and Esperer Holdings. ECF No. 17. Wooten alleged that Hammon Plating, AMC, and Esperer Holdings were liable for breach of contract, breach of promissory note, breach of guaranty, and specific performance. *Id.*

On September 30, 2016, Hammon Plating, Esperer Holdings, and AMC filed an answer to Wooten's counterclaims and third-party complaint. ECF No. 40.

Case No. 16-CV-03951-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

On May 5, 2017, Wooten filed a motion for partial summary judgment. ECF No. 71 ("Mot."). On June 6, 2019, Hammon Plating filed an opposition. ECF No. 72 ("Opp."). On June 15, 2017, Hammon Plating filed a reply. ECF No. 73 ("Reply").

## II.     LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the moving party.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattret*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. However, on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to

United States District Court
Northern District of California

United States District Court
Northern District of California

judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

**B.     State Law in Diversity Cases**

"In determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court." *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011). If a state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict "how the state high court would resolve it." *Id.*; *AirSea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 186 (9th Cir. 1989) (internal quotation marks omitted). In the absence of clear authority, the Court looks for guidance from decisions of the state appellate courts and other persuasive authorities, such as decisions from courts in other jurisdictions and treatises. *Strother v. S. Cal. Permanent Med. Grp.*, 79, F.3d 859, 865 (9th Cir. 1996). "In assessing how a state's highest court would resolve a state law question[,] . . . federal courts look to existing state law without predicting potential changes in that law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001).

**III.     DISCUSSION**

Wooten moves for partial summary judgment on Hammon Plating's breach of contract claim, summary judgment on Hammon Plating's fraud claim, and summary judgment on Hammon Plating's implied covenant of good faith and fair dealing claim. The Court considers each in turn.

**A.     Breach of Contract**

Wooten moves for partial summary judgment on Count One of Hammon Plating's Complaint, which alleges that Wooten is liable for breach of contract. Specifically, the Complaint alleges that Wooten breached three provisions of the Agreement. First, Hammon Plating alleges

13

that Wooten breached ¶ 3.16(i) of the Agreement because the cost of the environmental remediation efforts exceeded $300,000. Compl. ¶ 32. Second, Hammon Plating alleges that Wooten breached ¶ 3.11 of the Agreement because Hammon Plating's Profit Sharing Plan was not compliant with ERISA. *Id.* ¶ 33. Third, Hammon Plating alleges that Wooten breached ¶ 3.18 of the Agreement because Hammon Plating lacked a permanent occupancy permit for 882 Commercial Street. *Id.* ¶ 34.

Wooten does not move for summary judgment on Hammon Plating's subclaim that Wooten breached the Agreement because the Profit Sharing Plan was not compliant with ERISA. Mot. at 5. Rather, Wooten moves for summary judgment only on Hammon Plating's subclaims that Wooten breached the Agreement because the environmental remediation efforts exceeded $300,000, and because Hammon Plating lacked a permanent occupancy permit for 882 Commercial Street. *Id.*

The Court begins by addressing relevant legal standards for a breach of contract claim, and then the Court discusses the subclaims at issue.

### 1. Interpretation and Breach

Under California law, a breach of contract claim requires establishing (1) the existence of a contract; (2) plaintiff's performance of the contract or excuse for nonperformance; (3) defendant's breach; and (4) the resulting damage to plaintiff. *Lortz v. Connell*, 273 Cal. App. 2d 286, 290 (1969). Here, Wooten argues that there is no genuine dispute of material fact as to the third element: whether Wooten breached the Agreement. *See* Mot. at 5.

Determining whether Wooten breached the Agreement requires interpreting the provisions of the Agreement. Under California law, a contract "must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636; *see also Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 390 (2005) ("The fundamental goal of contractual interpretation is to give effect to the mutual interpretation of the parties."). "Such intent is to be inferred, if possible,

Case No. 16-CV-03951-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

solely from the written provisions of the contract." *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990). "If contractual language is clear and explicit, it governs." *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992). "[I]f the meaning of the contractual language is susceptible to multiple reasonable interpretations, courts may consider extrinsic evidence to determine the parties' intent." *Pub. Storage v. Sprint Corp.*, 2015 WL 1057923, at *6 (C.D. Cal. Mar. 9, 2015) (citing *Wolf v. Superior Court*, 114 Cal. App. 4th 1343 (2004)).[1]

Under California law, "[t]he decision whether to admit parol evidence involves a two-step process." *Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (Cal. Ct. App. 1992). "First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party." *Id.* "If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract.'" *Id.* "When there is no material conflict in the extrinsic evidence, or where the contractual language is unambiguous, the court interprets the contract as a matter of law.'" *Pub. Storage*, 2015 WL 1057923, at *5. "However, if the interpretation turns upon the credibility of conflicting extrinsic evidence, or if 'construing the evidence in the nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's position,' summary judgment is inappropriate.'" *Phoenix Tech. Ltd. v. VMWare, Inc.*, 2017 WL 1289863, at *3 (N.D. Cal. Jan. 6, 2017) (quoting *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006)).

---

[1] Hammon Plating argues briefly in its opposition that Wooten's extrinsic evidence is inadmissible under the Federal Rules of Evidence to explain the Agreement. *See* Opp. at 10 (citing Federal Rules of Evidence 401, 403, 1004, and 1007). However, in California, "the parol evidence rule is a substantive rule of state law" and "California's [parol evidence] rule must be applied by a federal court in connection with any claim arising under California law." *Jankowski v. Persolve, LLC*, 2013 WL 12155184 (C.D. Cal. June 14, 2013) (citing *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 998–99 (9th Cir. 2001)). As explained further below, under California's parol evidence rule, the Court may consider Wooten's extrinsic evidence to help interpret the Agreement. Accordingly, Hammon Plating's citations to the Federal Rules of Evidence are inapposite, and Hammon Plating's evidentiary objections are overruled.

15

### 2. Environmental Remediation Subclaim

The Court first considers Hammon Plating's subclaim that Wooten breached ¶ 3.16(i) of the Agreement because the environmental remediation costs exceeded $300,000. Paragraph 3.16(i) of the Agreement provides:

> (i) Neither the Company, any of its Subsidiaries nor the Seller is aware of or reasonably anticipates any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might prevent, impede or materially increase the costs associated with the ownership, lease, operation, performance or use of the Company, any of its Subsidiaries, the Business or the Assets as currently carried out.

Agreement, ¶ 3.12(i). According to Hammon Plating, Wooten "estimated that the remaining [environmental remediation] cleanup would cost approximately $300,000 and that sum was to be placed in an escrow account for the continuing payment of the cleanup." *Id. ¶* 21. Hammon Plating alleges that Wooten breached ¶ 3.16(i) of the Agreement by "fail[ing] to ensure that the cost of the cleanup would meet the" $300,000 amount. *Id.* ¶ 32.

Wooten moves for summary judgment on this subclaim because, according to Wooten, ¶ 3.16 of the Agreement does not provide that the environmental remediation costs would not exceed the $300,000 amount placed in escrow. To the contrary, Wooten contends, the Agreement contemplated that the environmental remediation costs might exceed $300,000, and the Agreement explicitly allocated amongst the parties the risk that the environmental remediation costs might exceed $300,000. Thus, Wooten argues, it did not breach the Agreement by failing to ensure that the environmental remediation costs did not exceed the $300,000 amount set aside in escrow.

Specifically, Wooten contends that the environmental remediation costs were addressed in two provisions of the Agreement. First, ¶ 1.2(b) of the Agreement provides:

> (b) The Seller shall provide, prior to closing, an amount of cash placed in an escrow account equal to $300,000 to cover the anticipated cost of remediation for the Environmental Claims that are outstanding as of the Closing Date, provided that the Buyer shall pay the Seller any remaining balance of such funds after such remediation has been completed. **Any amount above and beyond $300,000 that the remediation costs, shall be deducted from the**

16

**final installment payment under the Promissory Note**.

Agreement, ¶ 1.2(b) (emphasis added). Second, ¶ 1.3(f) of the Agreement provides:

> (f) *Environmental Remediation Adjustment*. If the aggregate cost of remediation for the Environmental Claims that are outstanding as of the Closing Date **exceeds $300,000, the outstanding principal amount of the Promissory Note shall be reduced by the amount of the additional cost for such remediation.**

Agreement, ¶ 1.3(f) (emphasis added).

According to Wooten, these paragraphs show that the parties intended the $300,000 escrow amount to not be a *limit* on the environmental remediation costs, but rather the parties intended the $300,000 amount to be an estimate that the Agreement acknowledged might be exceeded. Thus, Wooten argues, it did not breach the Agreement by failing to ensure that the environmental costs did not exceed $300,000, as Hammon Plating alleges.

To the extent that ¶¶1.2(b) and 1.3(f) conflict with ¶ 3.16(i) and create an ambiguity in the Agreement, the Court considers the extrinsic evidence. Under the two-step process used by California courts, the Court first "provisionally receives (without actually admitting)" the extrinsic evidence proffered by Wooten to determine whether the Agreement is "reasonably susceptible" to the interpretation urged by Wooten. *Winet*, 4 Cal. App. 4th at 1165.

Rapoport's affidavit states that, based on the parties' negotiations and the language in the Agreement, Rapoport "understood that [Wooten] would be responsible for the first $300,000 of the environmental remediation costs; that [Hammon Plating] would then pay any amount in excess of $300,000 necessary to complete the environmental remediation; and that the principal amount due to [Wooten] under the $3.839 million Promissory Note would be reduced dollar for dollar for any amounts in excess of $300,000 expended by [Hammon Plating] to complete the environmental remediation." Rapoport Aff. ¶ 13.

Sorenson testified similarly at his deposition:

> Q: [The Agreement] recited that the sellers would put up $300,000 in an escrow account to cover environmental remediation; is that correct?
>
> A [Sorenson]: Right.

Q: If the [environmental remediation] amount exceeded that, the cost in excess of $300,000 would be deducted from the promissory note that had been given to [Wooten]; is that right?

A: It could be.

Q: That would reduce the amount due to [Wooten] under the promissory note?

A: Right.

Q: Didn't that assume that the costs for [the environmental] remediation in excess of $300,000 would be paid by your side of the equation and that's why you would be entitled to a reduction of the promissory note?

. . .

A: Yeah. I mean, I think that's a fair characterization of the way the deal was supposed to work.

Sorenson Dep. at 86. Similarly, Sorenson testified:

Q: And so you close the [A]greement with the understanding that there would be $300,000 set aside in an environmental escrow. Is that correct so far?

A [Sorenson]: I think so.

Q: And if there was an additional cost, that would be paid by Hammon Plating and then reduced from the promissory note that was due – otherwise due to [Wooten]; is that correct?

A: Right.

*Id.* at 104.

In light of this extrinsic evidence, the Court finds that the language of the Agreement is "reasonably susceptible" to the interpretation urged by Wooten. Specifically, the Court finds that the Agreement is reasonably susceptible to Wooten's interpretation that the $300,000 escrow amount was not established in the Agreement as a limit on the amount of the environmental remediation cost, but rather that the Agreement contemplated that the environmental remediation costs might exceed $300,000, that the amount over $300,000 would be paid by Hammon Plating, and that Hammon Plating would be entitled to a corresponding dollar-for-dollar reduction in the promissory note due to Wooten.

18

Indeed, "there is no material conflict in the extrinsic evidence." *Pub. Storage*, 2015 WL 1057923, at *6. As set forth above, both Rapoport and Sorenson testified to the exact same understanding of the Agreement's terms. *See* Sorenson Dep., at 104. Accordingly, because there is no conflict in the extrinsic evidence, the interpretation of the Agreement is "a matter of law." *Pub. Storage*, 2015 WL 1057923, at *6. Considering the text of the Agreement and the relevant extrinsic evidence, the Court agrees with Wooten that the Agreement contemplated that the environmental remediation costs might exceed the $300,000 amount placed in escrow, that Hammon Plating would pay for the costs above $300,000, and Hammon Plating would be entitled to a corresponding reduction from the Promissory Note that was otherwise due to Wooten. Accordingly, the Court finds as a matter of law that Wooten did not breach the Agreement by failing to ensure that the environmental remediation costs did not exceed the $300,000 amount set aside in escrow.

Significantly, in its opposition to Wooten's motion for summary judgment, Hammon Plating does not contest the fact that "there was a provision made in the [Agreement] for a discrete [environmental remediation] issue raised with the DTSC," and that the Agreement explicitly provided for the allocation of those costs in excess of the $300,000 escrow amount. Opp. at 8. Nonetheless, Hammon Plating contends, "there are now myriad environmental issues that threaten the continued operations of [Hammon Plating]" that have remediation costs in excess of the amount referenced in the Agreement. *Id.* at 8.

However, for several reasons, Hammon Plating's argument is unpersuasive. First, although Hammon Plating references "myriad environmental issues" in its opposition and contends that Wooten breached the Agreement regarding these "environmental issues," these "environmental issues" are not the subject of Hammon Plating's Complaint. The Complaint discusses the $300,000 placed into escrow, which was intended to cover the environmental remediation costs of the DTSC's clean up of "PCE" and "TCE." *See* Compl. ¶ 21; *see also* Rapoport Aff. ¶ 5. The Complaint alleges only that Wooten "breached section 3.16(i) of the

19

Agreement when [Wooten] failed to ensure that the cost of the cleanup would meet" the $300,000 amount stated in the Agreement. *Id.* ¶ 32. The Complaint does not identify any other "environmental issues" or other environmental remediation costs. *See generally id.*

The Ninth Circuit has held that "when issues are raised in opposition to a motion to summary judgment that are outside the scope of the complaint," the Court should "construe[] the matter raised as a request . . . to amend the pleadings out of time." *Desertrain v. City of L.A.*, 754 F.3d 1147, 1154 (9th Cir. 2014). On September 28, 2016, this Court set January 11, 2017 as the last day to amend the pleadings. ECF No. 37. Hammon Plating filed its opposition to Wooten's motion for summary judgment on June 15, 2017, which is approximately five months after the January 11, 2017 deadline to amend the pleadings. *See* Opp. Accordingly, Hammon Plating must first show "good cause" for amendment under Rule 16(b) and, if "good cause" is shown, Hammon Plating must demonstrate that amendment is proper under Rule 15. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992). Under Rule 15, the Court may deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment." *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008) (brackets and internal quotation marks omitted).

Hammon Plating did not raise these other "environmental issues" until more than five months after the January 11, 2017 deadline to amend the Complaint. Hammon Plating does not offer a reason for this undue delay, and Hammon Plating does not explain these other "environmental issues" in its opposition. Moreover, Wooten addressed in its motion for summary judgment only the environmental remediation concerns that were the subject of the Complaint, and thus Wooten would be unfairly prejudiced if Hammon Plating were allowed to amend its Complaint at this stage of the proceedings to raise these other unspecified "environmental issues." The final pretrial conference is August 31, 2017, and the five day bench trial is September 18,

United States District Court
Northern District of California

2017. ECF No. 37. To allow Hammon Plating to add a new claim two months from trial would be unduly prejudicial to Wooten.

Accordingly, the Court finds that Hammon Plating has not shown good cause to amend the Complaint under Rule 16, and Hammon Plating has not shown that amendment is proper under Rule 15. *See Luxul Tech. Inc. v. NectarLux,* LLC, 2016 WL 3345464, at *11 (N.D. Cal. June 16, 2016) (finding movant failed to show amendment was proper at summary judgment stage where deadline to amend the pleadings had passed and where it would be unfairly prejudicial to the other party to permit amendment at late stage of the proceedings). Hammon Plating is thus limited to the allegations in its Complaint that Wooten breached the Agreement by failing to ensure that the environmental remediation costs did not exceed $300,000. As stated above, Wooten did not breach the Agreement because the Agreement explicitly contemplated that the environmental remediation costs would exceed $300,000, and the Agreement explicitly allocated this risk amongst the parties.

Moreover, even if this Court were to consider Hammon Plating's new allegations that Wooten breached the Agreement because of these other "myriad environmental issues," Opp. at 8, the Court would find that summary judgment in favor of Wooten is nonetheless appropriate. In support of Hammon Plating's argument that there are genuine issues of material fact regarding "myriad environmental issues," Hammon Plating cites to Sorenson's deposition testimony. *Id.* However, the citations offered by Hammon Plating do not establish that Wooten breached the Agreement with regards to any environmental issues. The only relevant citation offered by Hammon Plating is a citation to Sorenson's deposition in which Sorenson testifies that "[t]he history of challenges with the EPA were omitted" from the information given to Sorenson by Wooten. *Id.* at 54. Sorenson does not provide in his deposition testimony any further information about these "challenges with the EPA," and Hammon Plating does not provide any further information in its opposition. *See* Opp. at 8. Indeed, the Court is not aware of any evidence in the record that discusses Hammon Plating's "challenges with the EPA," or how these challenges

breached the Agreement. Hammon Plating's contention that Wooten breached the Agreement because of unspecified environmental issues "is far too vague and undetailed to raise a genuine dispute of material fact." *Viera v. Lewis*, 2014 WL 3853142, at *4 (N.D. Cal. Aug. 4, 2014).

To summarize, Hammon Plating's Complaint alleges that Wooten breached the Agreement by failing to ensure that the environmental remediation costs met the $300,000 amount stated in the Agreement. However, the Court finds that the Agreement explicitly contemplated that the environmental remediation costs would exceed $300,000, and the Agreement explicitly allocated amongst the parties the risk that the environmental remediation costs would exceed $300,000. Accordingly, Wooten did not breach the Agreement by failing to ensure that the environmental remediation costs met the $300,000 amount. To the extent that Hammon Plating now raises other "myriad environmental issues," Hammon Plating did not allege these additional issues in its Complaint. Moreover, even if the Court were to consider these other environmental issues, Hammon Plating does not provide sufficient evidence to create a genuine issue of material fact that Wooten breached the Agreement with regards to these unspecified environmental issues. Accordingly, the Court GRANTS summary judgment in favor of Wooten on Hammon Plating's breach of contract subclaim relating to environmental remediation costs.

### 3. Occupancy Permit Subclaim

The Court next considers Hammon Plating's subclaim that Wooten breached ¶ 3.18 of the Agreement by failing to acquire an occupancy permit for 882 Commercial Street. Paragraph 3.18 of the Agreement provides that "[t]he Company and its Subsidiaries hold all Permits necessary to conduct the Business and to own and use the Assets and all such Permits are in full force and effect." Agreement, ¶ 3.18. According to Hammon Plating, Wooten breached the Agreement "because Hammon Plating did not acquire a permanent occupancy permit which is required to do business in the City of Palo Alto." Compl. ¶ 34.

Wooten moves for summary judgment on this subclaim. According to Wooten, other provisions in the Agreement explicitly exempt the lack of a permanent occupancy permit at 882

Commercial Street from the warranties made in the Agreement. Thus, according to Wooten, because the Agreement exempted the permanent occupancy permit at 882 Commercial Street from the warranties in the Agreement, the permanent occupancy permit at 882 Commercial Street is not a "[p]ermit[] necessary" for Hammon Plating to conduct its business. *See* Rapoport Aff. ¶¶ 16–18.

Specifically, ¶ 3.12(e) of the Agreement provides:

> (e) As of the date of this Agreement . . . neither the Company, any of its Subsidiaries nor the Seller has received written notice, and to the Knowledge of the Seller, no other notice, from any Governmental Authority that the Real Property or the present use of the Real Property fails to comply with any applicable Laws, Governmental Orders, Permits or restrictions of any Governmental Authority having jurisdiction over any portion of the Real Property. **This clause does not include . . . the occupancy permit issue on 882 Commercial St.**

Agreement, ¶ 3.12(e) (emphasis added).

Similarly, ¶ 3.12(f) of the Agreement provides:

> (f) As of the date of this Agreement, there are no pending or, to the Knowledge of the Seller, threatened condemnation, fire, health, safety, environmental, building, zoning, land use or other Actions relating to any portion of the Real Property that, if successful, would adversely affect the current use or occupancy thereof, nor has the Company or the Seller received written notice, or to the Knowledge of the Seller, any other notice, of any pending or threatened special assessment proceedings affecting any portion of the Real Property. **This clause does not include . . . the occupancy permit issue on 882 Commercial St.**

*Id.* ¶ 3.12(f).

Significantly, in Hammon Plating's opposition to Wooten's motion for summary judgment, Hammon Plating concedes that the lack of an occupancy permit for 882 Commercial Street was "an exception to Wooten's warranty in the [Agreement]." Opp. at 9. Moreover, Hammon Plating acknowledges that Hammon Plating successfully acquired a permanent occupancy permit for 882 Commercial Street after the close of the Agreement. *Id.* Thus, Hammon Plating does not dispute that Wooten did not breach the Agreement by failing to acquire a permanent occupancy permit for 882 Commercial Street. *Id.*

Nonetheless, Hammon Plating contends, "[w]hile there are occupancy permits for all three

23

1  [Hammon Plating] properties, occupancy is not the key issue but rather use as a plating facility."

2  *Id.* Specifically, although Hammon Plating was successful in obtaining an *occupancy* permit for

3  882 Commercial Street, the City of Palo Alto refused to issue Hammon Plating a new *plating*

4  permit for 882 Commercial Street. *See* Smith Dep. at 118. The City of Palo Alto would not issue

5  a new plating permit because the City of Palo Alto no longer allows "wet floors," which are

6  required during the plating process. *Id.* at 118–19. Hammon Plating's location at 890

7  Commercial Street has a plating permit because that facility has grandfathered rights, and is thus

8  allowed to have "wet floors." *Id.* According to Hammon Plating, because the 882 Commercial

9  Street facility does not have a *plating* permit, Wooten is in breach of the Agreement because

10 Hammon Plating is lacking a permit "necessary to conduct" its business, as provided in ¶ 3.18 of

11 the Agreement. Agreement, ¶ 3.18; *see* Opp. at 9.

12      However, Hammon Plating's Complaint alleges only that Wooten breached ¶ 3.18 of the

13 Agreement "because Hammon Plating did not acquire a *permanent occupancy* permit." Compl. ¶

14 34 (emphasis added). The Complaint does not include any allegations regarding a plating permit.

15 *See id.* As discussed above, in order to raise an issue in its opposition that is outside of the scope

16 of the Complaint, Hammon Plating must first show "good cause" for amendment under Rule

17 16(b). If "good cause" is shown, Hammon Plating must demonstrate that amendment is proper

18 under Rule 15. *See Johnson*, 975 F.2d at 607–08. However, Hammon Plating waited more than

19 five months after the January 11, 2017 deadline to amend the Complaint to raise the plating permit

20 issue in its opposition. As with the environmental remediation subclaim discussed above,

21 Hammon Plating does not offer any reason for this undue delay. Wooten addressed in its motion

22 for summary judgment only the permanent occupancy permit issue that was the subject of the

23 Complaint, and thus Wooten would be prejudiced if Hammon Plating were allowed to amend its

24 Complaint to raise the plating permit issue at this stage of the proceedings. Moreover, the final

25 pretrial conference is August 31, 2017, and the five day bench trial is September 18, 2017. ECF

26 No. 37. To allow Hammon Plating to add a new claim two months from trial would be unduly

27

28

prejudicial to Wooten.  Accordingly, the Court finds that Hammon Plating has made no showing of good cause to amend the Complaint, and Hammon Plating has not shown that amendment is proper under Rule 15.  Hammon Plating is thus limited to the allegations in its Complaint that Wooten breached the Agreement by failing to acquire a permanent occupancy permit for 882 Commercial Street.  Hammon Plating concedes that the Agreement exempted the permanent occupancy permit from the warranties made in the Agreement.  Opp. at 9.  Accordingly, there is no genuine issue of material fact that Wooten breached the Agreement by failing to acquire a permanent occupancy permit at 882 Commercial Street.

Moreover, even if this Court were to allow Hammon Plating to amend its Complaint at this stage of the litigation to raise the plating permit issue, the Court would nonetheless find that summary judgment in favor of Wooten is warranted on this subclaim.  As stated above, Hammon Plating concedes that the Agreement excludes the "occupancy permit issue on 882 Commercial St." from the warranties in the Agreement, and thus that Wooten is not in breach of ¶ 3.18 with regards to the occupancy permit at 882 Commercial Street.  Opp. at 9.  Wooten contends that if the parties exempted the "occupancy permit issue on 882 Commercial St." from the Agreement, the parties *also* exempted the lack of a *plating* permit at 882 Commercial Street, and thus Wooten is not in breach of ¶ 3.18 with regards to the plating permit at 882 Commercial Street.  Accordingly, to resolve this issue, the Court must interpret the meaning of the phrase "occupancy permit issue on 882 Commercial St." to determine whether the "occupancy permit issue on 882 Commercial St." also includes the *plating* permit issue at 882 Commercial St.

First, the Court "provisionally receives" the extrinsic evidence offered by Wooten to determine whether the language is "reasonably susceptible" to the interpretation urged by Wooten. The relevant extrinsic evidence shows that Rapoport told Sorenson during the due diligence process that the 882 Commercial Street facility did not have an occupancy permit.  Rapoport Aff. ¶ 16.  Rapoport "explained to [Sorenson] the issues relating to getting the permit for 882 Commercial" Street.  *Id.* Ex. M.  Specifically, Rapoport told Sorenson on February 16, 2015 that

Rapoport thought that there were three possible outcomes to the lack of an occupancy permit at 882 Commercial Street. First, Rapoport explained that, because the Palo Alto Fire Department had annually inspected 882 Commercial Street since 2004, the City of Palo Alto might grandfather the 882 Commercial Street facility into "a new, viable permit and allow the fees to be paid and business to begin." *Id.* Second, Rapoport explained that the "City may require that the present structure [at 882 Commercial Street] and its intended use be brought up to present day Code," which could require up to two months of "construction at an unknown cost." *Id.* Third, Rapoport explained that the City of Palo Alto may consider the 882 Commercial Street facility as "applying for a new permit for *'metal plating'* which" the City of Palo Alto had already declared it would no longer issue. *Id.* (emphasis added). As a result of Rapoport's disclosures to Sorenson and Smith, the parties included negotiated language in ¶¶ 3.12(e) and 3.12(f) of the Agreement that exempted the "occupancy permit issue on 882 Commercial St." from warranties in the Agreement. *See* Agreement, at ¶¶ 3.12(e) & (f); *see also* Rapoport Aff. ¶ 17–18.

In light of this extrinsic evidence, the Court concludes that the phrase "occupancy permit issue on 882 Commercial St." is "reasonably susceptible" to the interpretation urged by Wooten that the "occupancy permit issue" exempt from the warranties in the Agreement *also* includes the possible lack of a plating permit. As set forth above, Rapoport told Sorenson that one possible resolution to the lack of a permanent occupancy permit was that the City of Palo Alto might consider Hammon Plating as "applying for a new permit for 'metal plating,' which the City" had already declared it would no longer issue. Rapoport Aff., Ex. M. Thus, at the time the parties exempted the "occupancy permit issue on 882 Commercial St." from the warranties in the Agreement, the parties were aware that the occupancy permit issue *also* included a potential lack of plating permit.

Significantly, as with the environmental remediation subclaim, "there is no material conflict in the extrinsic evidence." *Pub. Storage*, 2015 WL 1057923, at *6. Sorenson does not recall the February 16, 2015 telephone conversation with Rapoport, but Sorenson does not dispute

Case No. 16-CV-03951-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

that it occurred. Sorenson Dep. at 90, 117–18. Hammon Plating does not introduce any other evidence that contradicts Wooten's evidence. *See generally* Opp. Thus, because there is no conflict in the extrinsic evidence, the interpretation of the Agreement is "a matter of law." *Pub. Storage*, 2015 WL 1057923, at *6.

Considering the language of the Agreement and the relevant extrinsic evidence, the Court agrees with Wooten that the exemption in the Agreement for the "occupancy permit issue on 882 Commercial St." *also* includes the lack of a plating permit at 882 Commercial Street. The undisputed extrinsic evidence in the record shows that Rapoport told Sorenson that the lack of an occupancy permit at 882 Commercial Street might also result in the lack of a plating permit at 882 Commercial Street. Rapoport Aff. ¶ 16. As a result of Rapoport's disclosures regarding the lack of an occupancy permit at 882 Commercial Street, the parties exempted the "occupancy permit issue on 882 Commercial St." from warranties made in the Agreement. If the parties both understood at the time of negotiations that a possible resolution to the "occupancy permit issue" at 882 Commercial Street was that the City of Palo Alto might not issue Hammon Plating a plating permit for the 882 Commercial Street facility, it follows that the parties intended the "occupancy permit issue" exempt from the Agreement to *also* include the possible lack of a plating permit at 882 Commercial Street. Thus, the Court finds that there is no genuine dispute of material fact as to whether Wooten breached the Agreement because Hammon Plating could not acquire a plating permit at 882 Commercial Street.

To summarize, Hammon Plating concedes that the lack of an occupancy permit for 882 Commercial Street was "an exception to Wooten's warranty in the [Agreement]" and that Wooten did not breach the Agreement regarding the occupancy permit at 882 Commercial Street. Opp. at 9. Although Hammon Plating now states that the issue is the lack of a *plating* permit at 882 Commercial Street, that is not alleged in the Complaint, and Hammon Plating has not shown good cause to amend the Complaint at this stage of the litigation. Nonetheless, even if the Court were to consider Hammon Plating's new argument regarding the lack of a plating permit at 882

Commercial Street, summary judgment is still appropriate in favor of Wooten. The undisputed extrinsic evidence shows that the parties discussed during the negotiation process that the occupancy permit issue at 882 Commercial Street *also* included the possibility that a plating permit would not be granted at 882 Commercial Street. Thus, in exempting the "occupancy permit issue on 882 Commercial St." from the Agreement, the Court concludes that the parties also intended to exempt the possible lack of a plating permit at 882 Commercial Street from the warranties in the Agreement. The Court finds that there is no genuine dispute of material fact. Accordingly, the Court GRANTS summary judgment in favor of Wooten on Hammon Plating's breach of contract subclaim relating to permitting issues at 882 Commercial Street.

**B.      Fraud**

Wooten moves for summary judgment on Count Two of Hammon Plating's Complaint, which alleges that Wooten is liable for fraud because Wooten intentionally made false representations to Wooten in the Agreement. Compl. ¶ 36. Under California law, the elements of fraud are: (1) a false representation; (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979 (Cal. 2004).

According to Hammon Plating, Wooten made "three misrepresentations related to the [A]greement." *Id.* ¶ 37. First, Wooten "misrepresented the estimated cost and the extent of the cleanup and future costs relating to the environmental cleanup." *Id.* ¶ 38. Second, Wooten "misrepresented the fact that the Plan was compliant with E[RI]SA and that there were no pending claims against the [Profit Sharing Plan]." *Id.* ¶ 39. Third, that Wooten "misrepresented that the business had all the permits necessary to conduct the business." *Id.* ¶ 40.

The Court begins by discussing the ERISA subclaim. The Court then addresses Hammon Plating's subclaims that Wooten misrepresented the future costs relating to the environmental clean-up and that Wooten misrepresented that Hammon Plating had necessary permits to conduct its business.

28

### 1. ERISA Issue

Wooten moves for summary judgment on Hammon Plating's claim that Wooten misrepresented to Hammon Plating that the Hammon Plating Profit Sharing Plan was compliant with ERISA. Although Wooten acknowledges that the Hammon Plating Profit Sharing Plan is not compliant with ERISA, Wooten contends that summary judgment is appropriate with respect to Hammon Plating's fraud subclaim because Wooten discovered that the Profit Sharing Plan was not in compliance with ERISA "only after the [Agreement] closed [and] ERISA counsel was engaged." Mot. at 5.

In support of Wooten's motion for summary judgment, Wooten introduces an affidavit from Rapoport that the parties anticipated that the Profit Sharing Plan would be closed after the Agreement was signed. Rapoport Aff. ¶ 22. After the Agreement was signed, Rapoport retained Trucker Huss, a law firm that specializes in ERISA issues, to advise Wooten regarding the closing of the Profit Sharing Plan. *Id.* ¶ 23. Rapoport sent relevant documents to Trucker Huss, and Trucker Huss later informed Rapoport that there were ERISA compliance issues regarding the Profit Sharing Plan. *Id.* On December 7, 2015, Trucker Huss informed Esperer Holdings about the ERISA compliance issues. *Id.* Rapoport declares that neither Rapoport nor Wooten had any awareness of the ERISA compliance problems "until we received advice from [Trucker Huss] after the [Agreement] closed." *Id.* ¶ 24. Wooten also introduces deposition testimony from Smith. Smith testified that he had "no idea" whether there were any misrepresentations by Rapoport or other Wooten representatives regarding the Profit Sharing Plan's compliance with ERISA. *See* Smith Dep. at 153. According to Smith, he understood that the parties had questions about the Profit Sharing Plan prior to the closing of the Agreement, but Smith understood that those issues "were too complex to iron out before the [Agreement] closed." *Id.* at 154.

In its opposition to Wooten's motion for summary judgment, Hammon Plating does not cite *any* evidence in support of its allegations that Wooten knew that the Profit Sharing Plan was in violation of ERISA at the time that Wooten entered into the Agreement. *See* Opp. at 4. Indeed,

Hammon Plating's only substantive reference to the ERISA issue in its opposition is Hammon Plating's statement of facts. *See* Opp. at 4. There, Hammon Plating states only that the Agreement contained representations that there were no ERISA compliance issues with regards to the Profit Sharing Plan, but that Trucker Huss informed Esperer Holdings on December 7, 2015 that there were ERISA compliance issues regarding the Plan. *Id.* Hammon Plating does not cite any evidence, and the Court is not aware of any evidence in the record, that Wooten or any of his representatives knew that the Profit Sharing Plan was in violation of ERISA at the time that Wooten entered into the Agreement.

In sum, Hammon Plating has not introduced any evidence to rebut Wooten's evidence that Wooten was unaware of the ERISA compliance issues at the time the Agreement closed. Accordingly, unrebutted evidence in the record establishes that Wooten had no knowledge of the ERISA issue at the time that Wooten entered into the Agreement. Because there is no genuine dispute of material fact, summary judgment in favor of Wooten is appropriate on this subclaim. *See Moses v. Harward*, 2014 WL 12577167, at *11 (N.D. Cal. May 27, 2014) (granting summary judgment on fraud claim because there was no evidence that the defendant "knew that his statement was false" at the time that it was made to the plaintiff); *see also NRG Energy, Inc. v. Fuchs*, 2011 WL 13122185, at *6 (S.D. Cal. Sept. 20, 2011) (granting summary judgment on fraud claim where there was no evidence to show "that the alleged representations were false at the time they were made, as is required to establish a claim for fraud"). Thus, the Court GRANTS summary judgment in favor of Wooten on this subclaim.

**2. Environmental Remediation Issue**

Wooten also moves for summary judgment on Hammon Plating's subclaim that Wooten made a misrepresentation to Hammon Plating in ¶ 3.16(i) of the Agreement. Paragraph 3.16(i) of the Agreement provides:

> (i) Neither the Company, any of its Subsidiaries[,] nor the Seller is aware of or reasonably anticipates any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might prevent, impede or materially increase the costs

30

> associated with the ownership, lease, operation, performance or use of the Company, any of its Subsidiaries, the Business or the Assets as currently carried out.

According to Hammon Plating, Wooten misrepresented "the estimated cost and the extent of the cleanup and future costs relating to the environmental cleanup" at Hammon Plating facilities. Compl. ¶ 38. This subclaim relates to the same environmental remediation costs discussed above in Hammon Plating's breach of contract claim.

According to Wooten, there is no genuine issue of material fact about the environmental remediation costs. Specifically, Wooten asserts that Rapoport disclosed to Esperer Holdings during the due diligence process that Hammon Plating had voluntarily entered into a FICA Agreement with the DTSC concerning the contamination of Hammon Plating facilities with "PCE" and "TCE," which are chemical solvents used during the plating process. Rapoport Aff. ¶ 5. The FICA Agreement required Hammon Plating to cooperate in the assessment of the environmental contamination and, upon approval by DTSC, required Hammon Plating to cooperate in the completion of environmental remediation efforts. *Id.* The FICA Agreement required Hammon Plating to fund these environmental remediation efforts. *Id.*

In order to comply with the FICA Agreement, Rapoport retained Green Environment as an environmental consultant. *Id.* ¶ 5. Further, as a result of the disclosures made by Rapoport during the due diligence process, Esperer Holdings retained its own environmental consultant, Enviro-Assessment. *Id.* ¶ 6. Rapoport regularly updated Esperer Holdings about Rapoport's current understanding of the status of the environmental remediation efforts. *Id.* ¶ 7.

Green Environment told Rapoport that a concrete assessment of remediation efforts was challenging because DTSC needed to approve a remediation plan. *Id.* ¶ 8. Based on his conversations with Green Environment, Rapoport told Esperer Holdings that a "ballpark figure" was between $150,000 and $200,000, in addition to approximately $58,000 in fees to DTSC. *Id.* ¶ 8. Other evidence in the record shows that representatives of Wooten told Esperer Holdings that $200,000 was a "[r]ough estimate" of the costs based on conversations with Green Environment. *Id.* ¶ 8.

31

As a result of these discussions, the parties included in the Agreement provisions to allocate the risk of the environmental contamination costs. As set forth above regarding Hammon Plating's breach of contract claims, ¶ 1.2(b) of the Agreement provides:

> (b) The Seller shall provide, prior to closing, an amount of cash placed in an escrow account equal to $300,000 to cover the anticipated cost of remediation for the Environmental Claims that are outstanding as of the Closing Date, provided that the Buyer shall pay the Seller any remaining balance of such funds after such remediation has been completed. Any amount above and beyond $300,000 that the remediation costs[] shall be deducted from the final installment payment under the Promissory Note.

Agreement, ¶ 1.2(b). Similarly, ¶ 1.3(f) of the Agreement provides:

> (f) *Environmental Remediation Adjustment*. If the aggregate cost of remediation for the Environmental Claims that are outstanding as of the Closing Date exceeds $300,000, the outstanding principal amount of the Promissory Note shall be reduced by the amount of the additional cost for such remediation.

*Id.* ¶ 1.3(f).

Representatives of Esperer Holdings offered testimony that was similar to Rapoport's understanding of the environmental remediation efforts and costs. Smith testified that Rapoport represented during negotiations that the $150,000 to $250,000 estimate was a "ballpark figure" and a "rough estimate." Smith Dep. at 94–96. Smith understood that the "rough estimate" was based on information provided to Wooten by Green Environment. *Id.* at 96. Smith testified that he understood that the environmental remediation plan was a "moving target" and that "[t]he costs were unknown" at the time of the Agreement. *Id.* at 100–04, 153. According to Smith, Rapoport was "forthcoming" about the environmental issues and the ongoing remediation efforts. *Id.* at 99.

Sorenson's deposition testimony is similar to Smith's. Sorenson knew that Wooten engaged Green Environment to propose environmental remediation solutions, and that the DTSC needed to review and ultimately approve those solutions. Sorenson Dep. at 67. Sorenson testified that he "[p]robably" communicated with Green Environment prior to the close of the Agreement. *Id.* at 66–67. Sorenson testified that Esperer Holdings hired Enviro-Assessment to conduct an environmental study of the Hammon Plating properties on behalf of Esperer Holdings. *Id.* at 68–

32

69. Sorenson "knew there was a bureaucratic element" to the environmental remediation problem, and Sorenson testified that all parties "agreed there was uncertainty" about the environmental remediation costs. *Id.* at 67, 102. Sorenson stated that he understood that Rapoport had provided a "rough estimate" of the environmental remediation costs, and that the environmental remediation costs "were as yet unknown" at the time of the Agreement. *Id.* at 103. Sorenson testified that a "fair characterization of the way the [Agreement] was supposed to work" was that $300,000 was to be placed in escrow to cover the anticipated costs of the environmental remediation, and if the environmental remediation costs exceeded that amount, Hammon Plating would pay and Hammon Plating would be "entitled to a reduction of the promissory note." *Id.* at 86, 104. Sorenson testified that he still does not know the total cost of the environmental remediation efforts. *Id.* at 139.

Significantly, Hammon Plating does not cite *any* evidence in the record that suggests that Wooten made a knowingly false representation to Esperer Holdings during the negotiation process about the environmental remediation efforts or the estimated environmental remediation costs. Rather, as set forth above, the evidence in the record shows that Rapoport disclosed to Esperer Holdings during the due diligence process that Wooten entered into a FICA Agreement with DTSC concerning the contamination of Hammon Plating facilities with environmental contaminants used during the plating process. Rapoport told Esperer Holdings that Wooten hired Green Environment to propose environmental remediation solutions, and that those solutions needed to be approved by DTSC. Rapoport told Esperer Holdings that Hammon Plating was responsible for paying for the environmental remediation. Rapoport gave Esperer Holdings a "ballpark figure" of the environmental remediation costs based on information that Green Environments provided to Rapoport. Esperer Holdings hired its *own* environmental consultant, Enviro-Assessment. All parties understood Green Environment's environmental remediation cost estimate to be a "rough estimate" and a "moving target." Accordingly, the parties included negotiated language in the final version of the Agreement that was intended to allocate the risk of

the environmental remediation costs exceeding the estimated amount. Moreover, the final

Agreement called for AMC to pay $9.339 million for Wooten's stock in Hammon Plating, while

the original letter of intent listed a purchase price of approximately $20 million. Rapaport Aff. ¶

3. According to Rapoport, he understood the reduction in purchase price to reflect the uncertain

environmental remediation costs and the occupancy permit issue that were disclosed during the

course of the due diligence process. Rapoport Aff. ¶ 21. Neither Smith nor Sorenson contradict

this. Thus, the over 50% reduction in the purchase price during the course of the due diligence

process further suggests that Wooten disclosed to Esperer Holdings the unresolved environmental

remediation issues and the uncertainty surrounding those issues. *See id.*

In sum, although the environmental remediation cost estimate given during negotiations

turned out to be incorrect, there is no evidence in the record that Wooten "knew that [the estimate]

was false" at the time that it was made during the course of the negotiations, or that Wooten

misrepresented any other facts about the environmental remediation issue.[2] *See Moses*, 2014 WL

12577167, at *11. Thus, because there is no evidence in the record that Wooten made a

knowingly false representation to Hammon Plating about the environmental remediation issue, the

Court GRANTS summary judgment in favor of Wooten on this subclaim.

### 3. Occupancy Permit Issue

Wooten next moves for summary judgment on Hammon Plating's subclaim that Wooten

"misrepresented [in ¶ 3.18 of the Agreement] that the business had all the permits necessary to

conduct the business." Compl. ¶ 40. As set forth above regarding Hammon Plating's breach of

contract allegations, ¶ 3.18 of the Agreement provides as follows:

> *Permits; Compliance with Laws.* Schedule 3.18 sets forth a
> complete list of all Permits held by the Company and its
> Subsidiaries. The Company and its Subsidiaries hold all Permits

---

[2] To the extent that Hammon Plating seeks to rely on its statement that there are "myriad environmental issues" at Hammon Plating facilities that were not disclosed, as discussed above, the Complaint does not contain such allegations and, in any event, Hammon Plating's reference to these other environmental issues "is far too vague and undetailed to raise a genuine dispute of material fact." *Viera*, 2014 WL 3853142, at *4.

34

> necessary to conduct the Business and to own and use the Assets
> and all such Permits are in full force and effect. . . . The Company
> and each of its Subsidiaries have complied, and are now complying,
> with all Laws applicable to the Business and the Assets.

Agreement, ¶ 3.18.  The allegations supporting thus subclaim are the same allegations as the allegations discussed above regarding Hammon Plating's breach of contract subclaim concerning the permitting issues at 882 Commercial Street.

According to Wooten, there is no genuine issue of material fact as to this subclaim because there is no evidence in the record that Wooten made a false representation to Hammon Plating. Specifically, Wooten contends that Rapoport disclosed to representatives of Esperer Holdings during the course of the due diligence process that the 882 Commercial Street facility did not have an occupancy permit.  Further, Wooten asserts that Rapoport disclosed to representatives of Esperer Holdings that the City of Palo Alto may approve the 882 Commercial Street facility for an occupancy permit but nonetheless not issue the 882 Commercial Street facility a plating permit. Based on these disclosures, the parties included negotiated language in ¶¶ 3.12(e) and 3.12(f) of the Agreement that exempted the "occupancy permit issue on 882 Commercial St." from the warranties made in the Agreement.  *Id.* ¶ 17.  Accordingly, Wooten argues that there is no genuine issue of material fact that Wooten made a misrepresentation to Hammon Plating in ¶ 3.18 of the Agreement.

As discussed above regarding Hammon Plating's breach of contract claim, Rapoport's affidavit states that, during the course of the due diligence process, Rapoport learned that the 882 Commercial Street facility did not have an occupancy permit even though the facility had been used for years and annually inspected by the Palo Alto Fire Department.  Rapoport Aff. ¶ 15. Rapoport "shared this information with representatives of Esperer Holdings," including Smith and Sorenson.  *Id.*  On February 16, 2015, Rapoport had a telephone conversation with Sorenson, which Rapoport memorialized in a memorandum on February 17, 2015.  *Id.* ¶ 16.  According to the February 17, 2015 memorandum, Rapoport "explained to [Sorenson] the issues relating to getting the permit for 882 Commercial."  *Id.* Ex. M.  Specifically, Rapoport told Sorenson that he

United States District Court
Northern District of California

considered three possible outcomes. First, Rapoport explained that, because the Palo Alto Fire Department had annually inspected 882 Commercial Street since 2004, the City of Palo Alto grandfather the 882 Commercial Street facility into "a new, viable permit and allow the fees to be paid and business to begin." *Id.* Second, Rapoport explained that the "City may require that the present structure [at 882 Commercial Street] and its intended use be brought up to present day Code," which could require up to two months of "construction at an unknown cost." *Id.* Third, Rapoport explained that the City of Palo Alto may conclude that since the building did not have an occupancy permit, the City of Palo Alto would consider 882 Commercial Street facility as "applying for a new permit for 'metal plating' which the City has declared they will no longer issue." *Id.*

As a result of Rapoport's disclosures to Sorenson and Smith, the parties included negotiated language in ¶¶ 3.12(e) and 3.12(f) of the Agreement that exempted the "occupancy permit issue on 882 Commercial St." from the warranties in the Agreement. *See* Agreement, at ¶¶ 3.12(e) & (f); *see also* Rapoport Aff. ¶ 17–18. After the Agreement closed, Esperer Holdings engaged Rapoport to help in obtaining the necessary permits for 882 Commercial Street. *Id.* ¶ 19. The City of Palo Alto signed off on a temporary occupancy permit for the facility on February 20, 2015. *Id.* Rapoport told Esperer Holdings "that to secure a permanent certificate of occupancy at 882 Commercial Street," Esperer Holdings would need to (a) reinstall mechanical equipment, which was currently in storage; and (b) pass an inspection by the Palo Alto Fire Department. *Id.*; *see also id.* Ex. N & O.

Sorenson does not recall the February 16, 2015 telephone conversation with Rapoport, but Sorenson does not dispute that it occurred. Sorenson Dep. at 90, 117–18. Sorenson testified in his deposition that he "wouldn't say [its] [his] contention" that Wooten or representatives of Wooten failed to disclose information to Sorenson about the occupancy permit issue prior to the Agreement closing. *Id.* at 93–94. Similarly, Smith testified in his deposition that he knew that Rapoport was meeting with the City of Palo Alto regarding a permitting issue. Smith Dep. at 110.

36

After the close of the Agreement, Smith hired a company to reinstall the plating equipment at the 882 Commercial Street facility in order to obtain a permanent occupancy permit. *Id.* at 116. The Palo Alto Fire Department came and gave a final inspection. *Id.* at 117. The 882 Commercial Street facility passed the final inspection and was issued a permanent occupancy permit. *Id.* However, the City of Palo Alto would not issue the 882 Commercial Street facility a new permit to conduct plating operations because the City of Palo Alto would not permit "wet floors," which are required during the plating process. *Id.* at 118–19. The Hammon Plating facility at 890 Commercial Street has a plating permit because it has grandfathered rights, and is thus allowed to have "wet floors." *Id.*

Moreover, the final Agreement called for AMC to pay $9.339 million for Wooten's stock in Hammon Plating, while the original letter of intent listed a purchase price of approximately $20 million. Rapaport Aff. ¶ 3. According to Rapoport, he understood the reduction in purchase price to reflect the environmental remediation costs discussed above and the occupancy permit issue disclosed during the course of the due diligence process. Rapoport Aff. ¶ 21. Neither Smith nor Sorenson contradict this. Thus, the over 50% reduction in the purchase price during the course of the due diligence process further suggests that Wooten disclosed to Esperer Holdings the occupancy permit issue at 882 Commercial Street. *See id.*

Again, Hammon Plating does not cite in its opposition any evidence in support of its argument that Wooten misrepresented facts about the permits at 882 Commercial Street. As set forth above, the evidence in the record shows that Rapoport disclosed to representatives of Esperer Holdings that the 882 Commercial Street facility did not have an occupancy permit. Rapoport also disclosed to Sorenson that one possible resolution to the lack of an occupancy permit would be that the City of Palo Alto would not issue the 882 Commercial Street facility a new permit to conduct plating. In light of these disclosures, the parties explicitly exempted the "occupancy permit issue on 882 Commercial St." from the warranties in the Agreement. *See* Rapoport Aff. ¶¶ 18–19; Agreement, ¶¶ 3.12(e) & (f). Accordingly, the Court finds that there is no genuine issue

37

of material fact regarding whether Wooten made false representations to Hammon Plating about the permits at 882 Commercial Street. Thus, the Court GRANTS summary judgment in favor of Wooten on this subclaim.

## C.    Breach of the Implied Covenant of Good Faith and Fair Dealing

Finally, Wooten moves for summary judgment on Count Three of Hammon Plating's Complaint, which alleges that Wooten violated the implied covenant of good faith and fair dealing. This Claim relates to Wooten's alleged frustration of Hammon Plating's ability to obtain financing, as contemplated in the Agreement.[3]

Specifically, according to Hammon Plating, a third party lender agreed to offer financing to Hammon Plating, but only on the condition that Galen Wooten sign a subordination agreement that would subordinate the indebtedness due to her to a third-party lender. *See* Compl. ¶¶ 17–19. Galen Wooten has refused to sign a subordination agreement. *Id.* According to Hammon Plating, Galen Wooten's refusal to subordinate her debts to the third party lender has frustrated several provisions of the Agreement that relate to financing. Specifically, ¶ 5.15 provides that no party shall "engage in any conduct . . . that would result in the inability of the Buyer to finance the transaction or impair any Party's ability to close, except in the ordinary course of business consistent with past practice." Agreement, at ¶ 5.15. Paragraph 5.16 provides that "[f]ollowing the Closing, each of the Parties shall . . . execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement." *Id.* ¶ 5.16. Hammon Plating argues that Galen Wooten's refusal to subordinate her debts to a third-party lender breaches the implied covenant of good faith and fair dealing.

---

[3] In its opposition, Hammon Plating contends that the subordination issue is the only basis for its claim for breach of the implied covenant of good faith and fair dealing. To the extent that Hammon Plating also bases its implied covenant claim on the same allegations that underlie Hammon Plating's breach of contract claim discussed above, Hammon Plating's implied covenant claim is "superfluous with the contract cause of action." *Daly v. United Healthcare Ins. Co.,* 2010 WL 4510911, at 84 (N.D. Cal. Nov. 1, 2010) (finding implied covenant claims superfluous where the implied covenant claim is "based on the same breach" as the contract claim).

38

In California, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Devel. (Cal.), Inc. v. Marathon Devel. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992) (quoting Restatement 2d Contracts, § 205). "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Id.* at 372 (citing *Persue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985)). "'The implied covenant of good faith and fair dealing forbears either party from doing anything which will injure the right of the other to receive the benefits of the agreement.'" *Celador Intern. Ltd. v. Walt Disney Co.*, 2009 WL 10429760, at *19 (C.D. Cal. Mar. 6, 2009) (quoting *Foley v. U.S. Paving Co.*, 262 Cal. App. 2d 499, 505 (1968)). "The California Supreme Court has suggested that 'the covenant has both a subjective and an objective aspect—subjective good faith and objective fair dealing. A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable.'" *Gonzalez v. Alliance Bancorp.*, 2010 WL 1575963, at *7 (N.D. Cal. Apr. 19, 2010) (quoting *Carma Dev., Inc*, 2 Cal. 4th at 373). "[T]he implied covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." *Id.* "The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily a question of fact unless only one inference [can] be drawn from the evidence." *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 509 (2001) (internal quotation marks omitted).

The only evidence in the record regarding the subordination issue is in Rapoport's affidavit. Rapoport states that, during the negotiation process, there was "never any discussion" that either Galen Wooten or Thomas Wooten would subordinate the debts due to them to a third-party lender. *See* Rapoport Aff. ¶ 25. To the contrary, Rapoport states that he insisted during the course of negotiations that Thomas Wooten remain in the first position with regards to the debt owed to him. *Id.* Rapoport's affidavit states that the instant issue of subordination "surfaced long

after the closing of the" Agreement, and that Galen Wooten retained a separate attorney with regards to this issue. *Id.* Rapoport provides no further information regarding the instant circumstances of Galen Wooten's refusal to subordinate, and there is no further evidence in the record.

As the party moving for summary judgment, Wooten has the initial burden of production to "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). Wooten has not met this initial burden with regards to the implied covenant claim. Rapoport's affidavit states that the instant issue "surfaced long after the closing of the Agreement"—the time when Rapoport was involved—and that Rapoport did not represent Galen Wooten with regards to the subordination issue. *See* Rapoport Aff. ¶ 25. There is *no* further evidence in the record regarding the circumstances of the parties' instant subordination dispute. *Id.* Accordingly, because the Court has no information before it regarding the parties' instant subordination dispute, Wooten has not produced evidence "negating an essential element" of Hammon Plating's implied covenant of good faith and fair dealing claim, nor has Wooten produced evidence showing that Hammon Plating "does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103. Although it is doubtful that Galen Wooten's refusal to subordinate the debts due to her to a third-party lender is unreasonable, the Court cannot say on this record that "only one inference [can] be drawn from the evidence" such that summary judgment is appropriate. *Hicks*, 89 Cal. App. at 509. For this reason, the Court DENIES Hammon Plating's motion for summary judgment on Wooten's breach of the implied covenant of good faith and fair dealing claim to the extent that claim is based on Galen Wooten's alleged refusal to subordinate.

## IV. CONCLUSION

Case No. 16-CV-03951-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

For the foregoing reasons, the Court GRANTS in part and DENIES in part Wooten's motion for summary judgment as follows:

- The Court GRANTS Wooten's motion for partial summary judgment on Count One.
- The Court GRANTS Wooten's motion for summary judgment on Count Two.
- The Court DENIES Wooten's motion for summary judgment on Count Three to the extent Count Three is based on Galen Wooten's alleged refusal to subordinate the debt owed to her to a third-party lender.

**IT IS SO ORDERED.**

Dated: July 13, 2017

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

Case No. 16-CV-03951-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT