UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HAMMON PLATING CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>GALEN O. WOOTEN, PERSONAL REPRESENTATIVE OF THE ESTATE OF THOMAS WOOTEN,<br><br>Defendant. | Case No. 16-CV-03951-LHK<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| GALEN O. WOOTEN, PERSONAL REPRESENTATIVE OF THE ESTATE OF THOMAS WOOTEN,<br><br>Counterclaimant/Third Party Plaintiff,<br><br>v.<br><br>HAMMON PLATING CORPORATION, et al.,<br><br>Counterdefendant/Third-Party Defendants. | |

Having considered the evidence and arguments of counsel at the September 18, 2017

bench trial, and the record in this case, the Court hereby enters the following findings of fact and

conclusions of law.

## I.    FINDINGS OF FACT

### A.    Stock Purchase Agreement

1.    Plaintiff Hammon Plating Corporation ("Hammon Plating") is a business located in Palo Alto, California, which specializes in the electro-plating of metal components for industrial uses.

2.    In the spring of 2014, Thomas Wooten (then the sole owner of all shares in Hammon Plating) was approached by representatives of companies controlled by D. Stephen Sorensen ("Sorensen") regarding Thomas Wooten's interest in selling Hammon Plating.

3.    Thomas Wooten was then suffering from cancer and executed a power of attorney allowing his long-time counsel, William R. Rapoport ("Rapoport"), to arrange the sale of the business.  Thomas Wooten has since passed away, and his wife, Galen Wooten, is the personal representative of his estate.  Thomas Wooten and the estate of Thomas Wooten shall be referred to as "Wooten" in this order, and Galen Wooten, specifically, shall be referred to by her full name when necessary.

4.    The final terms of the transaction were set forth in the following three documents:

   (a)    a Stock Purchase Agreement ("Agreement") which was executed on February 18, 2015, and identified AMC Acquisition Corporation ("AMC") as the nominated buyer of the Hammon Plating stock for the purchase price of $9.339 million (Defendant's Exhibit "A", hereinafter "Agreement");

   (b)    a Promissory Note executed on February 18, 2015, in the principal amount of $3.839 million payable by AMC to Thomas Wooten (Defendant's Exhibit "C" (hereinafter, "Promissory Note"); and

   (c)    a Guaranty executed on February 18, 2015, in which Esperer Holdings guaranteed the repayment of all amounts due under the Promissory Note (Defendant's Exhibit "B", hereinafter "Guaranty").

### B.    Profit Sharing Plan

5. Hammon Plating sponsored a Profit Sharing Plan for its employees under the Employee Retirement Income Security Act ("ERISA") which qualified as a tax-exempt entity under relevant Internal Revenue Service ("IRS") regulations.

6. Paragraph 3.11(b) of the Agreement included a representation and warranty by Wooten that the Profit Sharing Plan "complies and has complied with its terms and all provisions of applicable law, including ERISA and the [IRS] Code." *See* Agreement, at ¶ 3.11(b).

7. Shortly after the Agreement closed, Rapoport retained Trucker Huss, a San Francisco law firm that specializes in ERISA compliance issues, to advise Wooten respecting the closing down of Hammon Plating's Profit Sharing Plan. Rapoport provided Hammon Plating's pension plan records to Trucker Huss.

8. Trucker Huss informed Rapoport that there were ERISA compliance issues regarding the Profit Sharing Plan. In a December 7, 2015 letter, Trucker Huss reported these concerns to James Scafide ("Scafide"), counsel for Esperer Holdings. Defendant's Exhibit "E." Specifically, Trucker Huss advised Scafide that "[i]t appears that for a number of years prior to the sale, the Plan and its fiduciaries violated the [IRS] Code and ERISA by extending loans to participants that exceeded their account balances and then failing to require repayment," in addition to the fact that the "Plan has not complied with various recordkeeping and disclosure requirements." *Id.*

9. In its December 7, 2015 letter, Trucker Huss proposed that Hammon Plating enter into a voluntary closing agreement with the IRS. Trucker Huss noted that Trucker Huss and Wooten would need authorization from Hammon Plating for Wooten to negotiate with the IRS on behalf of Hammon Plating. Defendant's Exhibit "E", at 2.

10. By letter from Rapoport to Wade Smith ("Smith") dated December 21, 2015, Rapoport requested that Hammon Plating respond to Trucker Huss's December 7, 2015 correspondence. *See* Defendant's Exhibit "F".

United States District Court
Northern District of California

11. There is no evidence that Smith or any other representative of Hammon Plating responded to Trucker Huss's December 7, 2015 letter until April of 2017, when Hammon Plating and Wooten jointly engaged Trucker Huss with regards to the ERISA compliance issue. *See* Defendant's Exhibit "G."

12. Robert Schwartz ("Schwartz"), an attorney with Trucker Huss who is lead counsel on the ERISA engagement, testified at trial that, until Trucker Huss received the authorization of Hammon Plating in April of 2017, Wooten could not negotiate with the IRS to resolve the ERISA compliance issues.

13. Trucker Huss has since engaged consultants whose services are necessary to update relevant books and records, and to prepare necessary income tax returns for submission to the IRS with a proposed voluntary closing agreement at the expense of Wooten. This work has not yet been completed.

14. Schwartz testified that by his estimates there is presently a shortfall of approximately $145,000 in the Hammon Plating Profit Sharing Plan. Schwartz testified that this amount has increased from the shortfall that Trucker Huss originally estimated in late 2015 because of the delay in addressing resolution with the IRS. *See also* Defendant's Exhibit "G", at 3. Schwartz further testified that the IRS may assess penalties, but that these amounts are uncertain until the IRS responds to a submission that Trucker Huss will make to the IRS later this year.

### C. Post Closing Price Adjustments

15. Paragraph 1.2(a) of the Agreement called for the Buyer to deliver $2 million in cash at the closing of the Agreement, in addition to the execution of a Promissory Note. Moreover, ¶ 1.2(d) of the Agreement provides that "[a]fter the closing [of the Agreement] and upon completion of the Buyer's financing, the Buyer will pay" a "Post Closing Down Payment" to Wooten. *See* Agreement, at ¶ 1.2.

16.     Under ¶ 1.2(d) of the Agreement, the stated amount of the Post Closing Down Payment was $3.5 million, which was subject to a variety of options respecting payment terms and potential price adjustments. *Id.*

17.     One option respecting payment terms under ¶ 1.2(d) of the Agreement was that, unless and until Hammon Plating secured financing to pay the Post Closing Down Payment, monthly payments of $75,000 would be made to Wooten. *Id.* These monthly payments would increase to $125,000 per month if the Post Closing Down Payment was not paid within 270 days of closing. *Id.*

18.     One potential price adjustment to the Post Closing Down Payment is provided in ¶ 1.3(g) of the Agreement and ¶ 3 of the Promissory Note. Those provisions provide that, if the remaining amount of the Post Closing Down Payment Amount was not paid within 120 days after the Closing, the Purchase Price would be increased by $200,000. *See* Agreement, at ¶ 1.3(g). If the remaining amount of the Post Closing Down Payment Amount was not paid within 270 days after the Closing, the Purchase Price would be increased by an additional $200,000. *Id.* In the event that the Purchase Price was increased by these amounts, the outstanding principal amount of the Promissory Note was to be increased by the same amount. *Id.*; *see also* Promissory Note, at ¶ 3.

19.     Other potential adjustments to the Post Closing Down Payment included adjustments for working capital under ¶ 1.3(b) of the Agreement. *See* Agreement, at ¶ 1.3(b). Specifically, ¶ 1.3(b) of the Agreement provides that "[w]ithin ninety (90) days after the Closing Date, the Buyer shall prepare and deliver to the Seller a statement (the 'Closing Working Capital Statement') setting forth [the Buyers] calculation of Closing Working Capital as of the Closing (the 'Final Closing Working Capital') prepared in accordance with GAAP." *Id.* Paragraph 1.3(c) of the Agreement further provided that, in the event the Seller disputed the Closing Working Capital Statement, "the Seller shall provide written notice (a 'Notice of Dispute') specifying in

5

reasonable detail all points of disagreement . . . within thirty (30) days after receipt of the Closing Working Capital Statement. If the Seller fails to deliver a Notice of Dispute within such thirty (30) day period, then the Closing Working Capital Statement as delivered by the Buyer shall be deemed final and used for purposes of Section 1.3(b)." *Id.* ¶ 1.3(c).

20.     By correspondence dated June 16, 2015, Hammon Plating claimed that it was entitled to offset $833,373 from the Post Closing Down Payment. *See* Plaintiff's Exhibit 3. This claimed offset consisted of (1) a claimed working capital adjustment of $497,891; (2) undisclosed expenses of $193,170; and (3) undisclosed liabilities of $142,312. *See id.*

21.     The Agreement closed on February 18, 2015, and thus the June 16, 2015 letter from Hammon Plating to Wooten appears to be outside of the 90 day deadline established in ¶ 1.3(b) of the Agreement for preparing and delivering the Closing Working Capital Statement. Nonetheless, the parties did not raise the timeliness issue at trial.

22.     According to Galen Wooten's testimony, which was also consistent with the testimony of William Rapoport, there was a shortfall in the inventory of gold that is used in electroplating operations. *See* Defendant's Exhibit "H".

23.     Galen Wooten and William Rapoport testified that the inventory of gold was depleted when the sale closed and that they agreed to reduce the monthly payments due from the buyer from $75,000 per month to $25,000 per month until this shortfall, which is valued at $166,221.66, was reimbursed.

24.     By correspondence dated August 12, 2015, Rapoport, acting on behalf of Galen Wooten, agreed to accept reduced monthly payments of $25,000 per month until the gold shortfall was reimbursed. *See* Plaintiff Exhibit 4. Rapoport further agreed to the proposed working capital adjustment of $497,891, unless this amount was later discovered to be erroneous. *Id.* Rapoport contested the other undisclosed expenses and undisclosed liabilities that were claimed by Hammon Plating. *Id*.

E.    **Subordination**

25.    Paragraph 5.16 of the Agreement provides that "[f]ollowing the Closing, each of the Parties shall . . . execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement." *See* Agreement, at ¶ 5.16.

26.    After the Agreement closed, Hammon Plating applied for financing that was intended to provide funds to allow Hammon Plating to pay Wooten the Post Closing Down Payment. Hammon Plating calculated the Post Closing Down Payment as $1.5 million. *See* Plaintiff's Exhibit 3, at 2. Hammon Plating reached this Post Closing Down Payment figure by subtracting Hammon Plating's claimed offsets, payments already made to Wooten, and amounts placed into environmental escrow, from the $3.5 million Post Closing Down Payment amount that was established by the parties in the Agreement. *See id*.

27.    In October of 2015, Hammon Plating requested that Galen Wooten subordinate all of the indebtedness remaining due to her in favor of Western Alliance Bank as a condition of the proposed loan. *See* Defendant's Exhibit "J."

28.    Rapoport testified that subordination had never been discussed during the course of negotiations regarding the Agreement. Instead, Rapoport had insisted during negotiations that Wooten be secured in first position, as set forth in his correspondence to Smith dated December 10, 2014. *See* Defendant's Exhibit "M."

29.    In October of 2015, Rapoport exchanged communications with Hammon Plating's counsel, Scafide, concerning Hammon Plating's request that Galen Wooten subordinate her indebtedness to the bank. *See* Defendant's Exhibit "K" & "L." Rapoport stated that subordination would be considered only with regard to the Post Closing Down Payment due to Wooten, and not with regard to debts due under the Promissory Note, which would not be paid by the proposed

loan. *See* Defendant's Exhibit "L", at 1.

30.    Galen Wooten testified that she was unwilling to subordinate the debt that was due to her because she had lost trust in Hammon Plating as a result of its failure to pay monthly payments in accordance with the Agreement.

### F.    Payments under the Agreement

31.    In February 2015, Wooten received $2 million in cash at the closing of the Agreement, pursuant to ¶ 1.2(a)(i) of the Agreement.

32.    Since the Agreement closed, Hammon Plating has paid Wooten monthly payments of $25,000 to satisfy the Post Closing Down Payment.  As of the date of trial, these payments totaled $725,000.

33.    Sorensen's testimony at his deposition was that the monthly payment amount of $25,000 was not a product of mutual agreement with Galen Wooten, but rather that was the amount that Hammon Plating was willing to pay given its claim that Wooten had breached the Stock Purchase Agreement.  *See* ECF No. 95, at 33-34.

34.    Wooten has received no payments under the terms of the Promissory Note.

## II.    CONCLUSIONS OF LAW

### A.    Hammon Plating's Claim under Count One for Breach of Contract

1.    Hammon Plating's Complaint alleges that Wooten breached three provisions of the Agreement:

(a)    Hammon Plating alleges that Wooten breached ¶ 3.16(i) of the Agreement because the cost of the environmental remediation efforts exceeded $300,000. Complaint ¶ 32.

(b)    Hammon Plating alleges that Wooten breached ¶ 3.18 of the Agreement because Hammon Plating lacked a permanent occupancy permit for 882 Commercial Street. *Id*. ¶ 34.

8

(c)  Hammon Plating alleges that Wooten breached ¶ 3.11 of the Agreement because Hammon Plating's Profit Sharing Plan was not in compliance with ERISA. *Id.* ¶ 33.

2.  By its Order Granting in Part and Denying in Part Defendant's Motion for Partial Summary Judgment filed July 31, 2017 (ECF No. 76), which is incorporated herein by reference, this Court ruled that Wooten was entitled to summary judgment on Hammon Plating's claim that Wooten had breached the Agreement because the cost of environmental remediation efforts exceeded $300,000, and to summary judgment on Hammon Plating's claim that Wooten had breached the Agreement because Hammon Plating lacked a permanent occupancy permit for 882 Commercial Street. This leaves for adjudication at trial Hammon Plating's claim that Wooten breached ¶ 3.11 of the Agreement because Hammon Plating's Profit Sharing Plan was not in compliance with ERISA.

3.  It is undisputed that Wooten represented under ¶ 3.11 of the Agreement that Hammon Plating's Profit Sharing Plan was in compliance with ERISA and the IRS Code. It is further undisputed that Wooten and Hammon Plating received legal advice after the closing of the Agreement that the Profit Sharing Plan was not in compliance with ERISA, which was reaffirmed by the testimony of Wooten's ERISA counsel, Robert Schwartz, at trial. The question remains whether this represents a breach of contract by Wooten.

4.  Paragraph 7.2(a) of the Agreement recites that Wooten shall "indemnify and hold harmless" AMC and Hammon Plating from "any and all Losses, resulting or arising from, based upon or otherwise relating to (i) any inaccuracy or breach of the Seller's representations and warranties set forth in this Agreement." *See* Agreement, ¶ 7.2(a).

5.  Paragraph 7.3(b) of the Agreement sets forth the procedure for securing a remedy for default of a contractual representation. Specifically, ¶ 7.3(b) requires the party claiming such indemnification to serve written notice "of a Direct Claim by reason of any of the representations,

warranties or covenants contained in this Agreement." This provision also allows the indemnifying party and its counsel "to investigate the matter or circumstance alleged to give rise to the Direct Claim." *See* Agreement, at ¶ 7.3(b). Paragraph 7.3(b) of the Agreement further requires that the party seeking indemnification for a direct claim "shall assist the Indemnifying Party's investigation by giving such information and assistance . . . as the Indemnifying Party or its counsel may reasonably request." *Id*.

6.      In this case, Wooten discovered after the Agreement closed that Hammon Plating was not in compliance with contractual representations regarding the Profit Sharing Plan. Wooten's counsel, the law firm Trucker Huss, served notice of the ERISA noncompliance issues on counsel for Hammon Plating on December 7, 2015. *See* Defendant's Exhibit "E." This notice requested that Hammon Plating provide Wooten the necessary authorization to enter into a voluntary closing agreement with the IRS. *Id*. at 2. Rapoport's correspondence to Wade Smith dated December 21, 2015, requested that Hammon Plating respond to the Trucker Huss correspondence. *See* Defendant's Exhibit "F." Despite the requirement in ¶ 7.3(b) that Hammon Plating "shall assist the Indemnifying Party's investigation by giving such information and assistance . . . as the Indemnifying Party or its counsel may reasonably request," Hammon Plating did not respond to Trucker Huss's notice to provide the necessary authorization that was necessary for Wooten to address the Profit Sharing Plan deficiencies with the IRS.

7.      In April of 2017, Hammon Plating and Wooten jointly engaged Trucker Huss to negotiate a resolution with the IRS. *See* Defendant's Exhibit "G." Since this time, Trucker Huss has begun to prepare a submission to the IRS. Although Trucker Huss believes that the IRS will require that cash deficiencies be reimbursed and may require the payment of penalties, the cost to cure presently remains uncertain.

8.      Based on the foregoing, at the close of Plaintiff's case, the Court granted Wooten's oral motion under Federal Rule of Civil Procedure 52 with regards to Hammon Plating's breach

10

of contract subclaim in Count One relating to the ERISA compliance issues. Specifically, the Court found that Galen Wooten is not in breach of ¶ 3.11 of the Agreement respecting ERISA noncompliance by the Profit Sharing Plan because Galen Wooten has not failed or refused to cure any liability when the liability was established, as required by ¶ 7.3(b) of the Agreement, because any delay in resolution of the ERISA noncompliance was a product of Hammon Plating's failure to cooperate in authorizing Wooten's counsel to negotiate with the IRS toward resolution, which is in violation of Hammon Plating's duties under the Agreement and its duty to mitigate damages.

9.     Under California law, a breach of contract claim requires establishing (1) the existence of a contract; (2) plaintiff's performance of the contract or excuse for nonperformance; (3) defendant's breach; and (4) the resulting damage to plaintiff. *Lortz v. Connell*, 273 Cal. App. 2d 286, 290 (1969). Based on the foregoing, as the Court ruled on the record, Wooten has not breached contractual obligations to Hammon Plating or AMC under the Agreement, and judgment shall be entered in favor of Wooten on Hammon Plating's Count One for breach of contract.

**B.     Hammon Plating's Claim under Count Two for Common Law Fraud**

10.     The Court adjudicated Hammon Plating's claim in Count Two of its complaint for common law fraud in its Order Granting in Part and Denying in Part Defendant's Motion for Partial Summary Judgment, ECF No. 76, which is incorporated herein by reference. The Court granted summary judgment in favor of Wooten on Hammon Plating's claim in Count Two.

**C.     Hammon Plating's Claim under Count Three for Breach of the Implied Covenant of Good Faith and Fair Dealing**

11.     In Count Three of its complaint Hammon Plating claims that Wooten is liable for breach of the implied covenant of good faith and fair dealing. Hammon Plating's claim for breach of the implied covenant of good faith and fair dealing is based on Galen Wooten's refusal to execute a subordination agreement that would have subordinated the indebtedness due to her in favor of a third-party lender. *See* ECF No. 72, at 9.

11

12. In California, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Devel. (Cal.), Inc. v. Marathon Devel. Cal., Inc*., 2 Cal. 4th 342, 371 (1992) (quoting Restatement 2d Contracts, § 205). "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Id*. at 372 (citing *Persue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985)). "'The implied covenant of good faith and fair dealing forbears either party from doing anything which will injure the right of the other to receive the benefits of the agreement.'" *Celador Intern. Ltd. v. Walt Disney Co*., 2009 WL 10429760, at *19 (C.D. Cal. Mar. 6, 2009) (quoting *Foley v. U.S. Paving Co*., 262 Cal. App. 2d 499, 505 (1968)). "The California Supreme Court has suggested that 'the covenant has both a subjective and an objective aspect—subjective good faith and objective fair dealing. A party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable.'" *Gonzalez v. Alliance Bancorp*., 2010 WL 1575963, at *7 (N.D. Cal. Apr. 19, 2010) (quoting *Carma Dev., Inc*., 2 Cal. 4th at 373). "[T]he implied covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." *Id*.

13. There is no express provision or requirement in the Agreement that Wooten agreed to subordinate her debt in order to allow Hammon Plating to secure financing to pay the Post Closing Down Payment. Rapoport testified that subordination had never been discussed during the course of negotiations regarding the Agreement. Rather, Rapoport insisted during negotiations that Wooten be secured in first position, as set forth in his correspondence to Smith dated December 10, 2014. *See* Defendant's Exhibit "M".

14. Hammon Plating bases its claim for breach of the implied covenant of good faith and fair dealing on ¶ 5.16 of the Agreement, which provides that "[f]ollowing the Closing, each of the

12

Parties shall . . . execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement." *Id.*

15. The Court concludes that Wooten's refusal to subordinate did not violate the Agreement or the implied covenant of good faith and fair dealing. The proposed financing agreement between Hammon Plating and Western Alliance Bank would have required Wooten to subordinate all of Hammon Plating's indebtedness to Wooten in favor of Western Alliance Bank. *See* Defendant's Exhibit "J". However, the proposed loan from Western Alliance Bank to Wooten would have paid Wooten only $1.5 million, as set forth in the June 16, 2015 correspondence from Christopher Kelly to Rapoport. *See* Plaintiff's Exhibit 3 at 2. This $1.5 million loan would not have paid Wooten the full amount owed to her by Hammon Plating. Specifically, it would not have paid Wooten the full amount of the Post Closing Down Payment, and it would have not paid Wooten any of the amounts due to Wooten under the Promissory Note. Thus, under the proposed financing agreement, Wooten would have been required to subordinate to Western Alliance Bank all of the debts owed to her by Hammon Plating, but the proposed loan to Hammon Plating from Western Alliance Bank would have left a substantial balance due to Wooten that was subordinated to Western Alliance Bank's debt. Rapoport, on behalf of Wooten, proposed to Hammon Plating that the subordination should not include debts due to Wooten under the Promissory Note, *see* Defendant's Exhibit "L", at 1, but there is no evidence that Hammon Plating responded to Rapoport's proposal.

16. Moreover, at that point in time, Wooten was mistrustful of Hammon Plating and concerned about securing payment because Hammon Plating had failed to fully honor its monthly payment commitments. The Court finds that these concerns were reasonable both objectively and subjectively under the circumstances. Moreover, there has been no showing that Wooten's refusal to subordinate injured the right of Hammon Plating to receive the benefits of the Agreement. The

13

Agreement by its terms stated that if financing was not secured, Hammon Plating would pay the Post Closing Down Payment in monthly installments, and the Promissory Note provided that so long as Hammon Plating continued to make the monthly payments in accordance with the Agreement, the annual payments that would otherwise be due under the Promissory Note would be deferred. *See* Promissory Note, at ¶ 2.

17.     Based on the foregoing, the Court finds that Wooten is not liable in Count Three for breach of the implied covenant of good faith and fair dealing.  Judgment shall be entered in favor of Wooten on Hammon Plating's Count Three for breach of the implied covenant of good faith and fair dealing.

### D.     Wooten's Counterclaim for Breach of Monthly Payment Obligations

19.     Count One of Wooten's Counterclaim and Third-Party Complaint ("Counterclaim") complains that Hammon Plating and AMC are in default of their obligation to make monthly payments under ¶ 1.2(d) of the Agreement.  *See* ECF No. 17, at 11-12.  Paragraph 1.2(d) of the Agreement provides that, until Hammon Plating secured financing to pay the Post Closing Down Payment, monthly payments would be made to Wooten of $75,000, which would increase to $125,000 per month if the Post Closing Down Payment was not paid within 270 days of closing. *See* Agreement, ¶ 1.2(d).  Since the Agreement closed, Hammon Plating has paid Wooten monthly payments of $25,000, totaling $725,000 to date.

20.     Under California law, "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract."  *Brown v. Grimes*, 192 Cal. App. 4th 265, 277, 120 Cal. Rptr. 3d 893, 902 (2011); *see also De Burgh v. De Burgh*, 39 Cal. 2d 858, 863, 250 P.2d 598 (1952) ("[I]n contract law a material breach excused further performance by [an] innocent party").  The Court entered its ruling above, in Conclusions of Law Section A, that Wooten is not in breach of her contractual obligations under the Agreement.

14

21. Hammon Plating and AMC thus were not discharged from their duty to make monthly payments in the amounts set forth in ¶ 1.2(d) of the Agreement, and are in material breach of the Agreement.

22. However, ¶ 1.5 of the Agreement provides for certain offsets from payment obligations owed under the Agreement. Specifically, ¶ 1.5 provides:

> The Buyer may set off against any of its payment obligations to the Seller pursuant to this Article I, including any payment obligations under the Promissory Note, any and all amounts owed to the Buyer or any other Buyer indemnified Parties by the Seller for any reason whatsoever, including without limitation, by virtue of Seller's obligations pursuant to Article VII.

*See* Agreement, ¶ 1.5.

23. The Agreement closed on February 18, 2015, and thus Hammon Plating's June 16, 2015 letter asserting entitlements to offsets from its payment obligations is outside the 90 day deadline established in ¶ 1.3(b) of the Agreement for preparing and delivering the Closing Working Capital Statement. Nonetheless, the parties did not raise the timeliness issue at trial.

24. The Court concludes that, pursuant to ¶ 1.5, Hammon Plating was entitled to offsetting credits against its monthly payment obligations in the total amount of $664,112.66. This amount includes (1) the gold shortfall of $166,221.66, and (2) the working capital adjustments of $497,891. The Court finds that the remaining offsets for undisclosed expenses and undisclosed liabilities, which were claimed by Hammon Plating in Christopher Kelly's June 16, 2015 correspondence, were disputed by Wooten and thus were never deemed final. *Id.* ¶ 1.3(c). Thus, Hammon Plating is not entitled to these offsets.

25. The Agreement provided that monthly payments of $75,000 would be paid to Wooten for the first 270 days after closing, and that the monthly payments would thereafter increase to $125,000 per month until the $3.5 million Post Closing Down Payment was satisfied. *See* Agreement, at ¶ 1.2(d). Monthly payments of $25,000 per month in fact were made to Wooten. Crediting the monthly payments that were made, in addition to the offsetting credits of

15

United States District Court
Northern District of California

$664,112.66 that the Court has concluded are supported by the evidence, Hammon Plating was in breach of its monthly payment obligations under the Agreement as of February 2016, when it should have paid Wooten $85,887.35 in addition to the monthly payment of $25,000 that was made that month. Hammon Plating has since breached its monthly payment obligations for 18 consecutive months by paying only $25,000 rather than $125,000 as required by the Agreement. The Court thus finds in favor of Wooten on Count One of her Counterclaim, and awards compensatory damages in favor of Wooten and against Hammon Plating and AMC jointly and severally in the amount of $1,885,887.35. Post-judgment interest will also be awarded on this amount pursuant to 28 U.S.C. § 1961(a) at the rate of 1.3% per annum.

### E.   Wooten's Counterclaim for Breach of the Promissory Note

26.    Count Two of Wooten's Counterclaim complains that AMC is in default of its obligation to make annual payments under the Promissory Note. *See* ECF No. 17, at 12-14. The Promissory Note by its terms provided that AMC would make an annual interest payment at the rate of 5% per annum on the first anniversary of the Promissory Note, February 18, 2016, and would make another interest payment at that rate plus $500,000 in principal on the second anniversary of the Promissory Note, February 18, 2017. *See* Promissory Note, at ¶ 2. The Promissory Note provides that, so long as plaintiff continued to make the monthly payments in accordance with the Agreement, the annual payments that would otherwise be due under the Promissory Note would be deferred. *See* Promissory Note, at ¶ 2. As set forth above, in Conclusion of Law Section D, the Court has concluded that Hammon Plating was not making monthly payments in accordance with the terms of the Agreement as of February 2016. Accordingly, the first annual payment under the Promissory Note fell due on or about February 18, 2016. The testimony is undisputed that no payments have been made under the Promissory Note.

27.    AMC contends that it was excused from performance under the Promissory Note due

16

to Wooten's material breach of contract. The Court reiterates and incorporates its findings above, in Conclusion of Law Section A, that Wooten was not in breach of her contractual obligations to AMC. AMC thus was not discharged from its duty to make annual payments to Wooten in the amounts set forth in Promissory Note, and AMC has been in material breach of contract since February 18, 2016 when it failed to make the annual interest payment that was due that date under the Promissory Note.

28. Regarding damages, the original principal amount of the Promissory Note was $3.839 million. *See* Promissory Note. However, ¶ 1.3(g) of the Agreement provided that, if the remaining amount of the Post Closing Down Payment Amount was not paid within 120 days after the Closing, the Purchase Price would be increased by $200,000, and if the remaining amount of the Post Closing Down Payment Amount was not paid within 270 days after the Closing, the Purchase Price would be increased by an additional $200,000. *See* Agreement, ¶ 1.3(g). Under the Agreement, these increases to the Purchase Price would be added to the outstanding principal amount of the Promissory Note. *Id.* Rapoport testified that these provisions were negotiated to, in effect, represent interest if funding of the Post Closing Down Payment was delayed. It is undisputed that the Post Closing Down Payment was not fully paid within 270 days of the Closing, and the Court has entered rulings above, in Conclusion of Law Section C, that Wooten did not violate the implied covenant of good faith and fair dealing by refusing to subordinate so that Hammon Plating could secure financing to pay the Post Closing Down Payment, which otherwise might have excused AMC's failure to perform. The Court thus concludes that the principal amount due under the Promissory Note increased to $4,039,000 on June 18, 2015, 120 days after the Agreement closed, and that the principal amount due under the Promissory Note further increased to $4,239,000 on November 15, 2015, which is 270 days after the Agreement closed.

29. The Promissory Note provides in ¶ 6 that, in the event of default, Wooten may elect

to accelerate the payment of all principal and interest that is due. Wooten made that election in ¶ 26 of her Counterclaim. *See* ECF No. 17, at 13. The Court thus concludes that all principal and interest which is due under the Promissory Note is presently due and payable.

30. The Promissory Note further provides in ¶ 6 that in the event of default, the interest rate of 5% per annum shall be increased an additional 5%, to an effective annual rate of 10% per annum. *See* Promissory Note, at ¶ 6. Pursuant to Cal. Civ. Code § 1671(b), this provision is valid unless Hammon Plating makes an affirmative showing that it is unreasonable under the circumstances. The Court concludes that this default interest rate, which is equivalent to the post-judgment interest rate set by statute in California under California Code of Civil Procedure § 685.010, is reasonable here. AMC was in default as of February 18, 2016, when it failed to make the first annual payment due to Wooten. Wooten is thus entitled to accrued interest on principal amounts due under the Promissory Note in the total amount of $872,200 as follows:

(a) interest at the rate of 5% per annum on the principal amount of $3,839,000 from February 18, 2015, until June 18, 2015, equaling $63,893;

(b) interest at the rate of 5% per annum on the principal amount of $4,039,000 from June 19, 2015, until November 15, 2015, equaling $84,145;

(c) interest at the rate of 5% per annum on the principal amount of $4,239,000 from November 19, 2015, until February 18, 2016, equaling $52,987;

(d) interest at the default rate of 10% per annum on the principal amount of $4,239,000 from February 19, 2016, until September 19, 2017, equaling $671,175.

31. The Promissory Note further provides in ¶ 6 that,"[u]pon the occurrence of an Event of Default, all parties liable for the payment of this Note agree to pay Holder reasonable attorneys' fees for the services of counsel employed to collect this Note, whether or not suit be brought, and whether incurred in connection with collection, trial, appeal or otherwise." *See*

18

Promissory Note, at ¶ 6. This provision is enforceable pursuant to California Code of Civil Procedure § 1021 and California Civil Code § 1717. The Court will award attorneys' fees incurred by Wooten in enforcing her rights to collect the Promissory Note upon appropriate application.

32. AMC contends that it is entitled to offset from the principal amount of the Promissory Note the amount that it expects to pay for environmental remediation pursuant to ¶¶ 1.2(b) and 1.3(f) of the Agreement. These provisions provide that the principal amount of the Promissory Note shall be reduced based on the actual expenses for environmental remediation that are paid by Hammon Plating. The evidence is that all remediation expenses to date have been paid by Wooten, and the deposition testimony of Sorensen admitted into evidence is that the actual expenses for environmental remediation which will actually be incurred by Hammon Plating remain uncertain to this day. *See* ECF No. 95, at 32. Although there is evidence that Hammon Plating has placed or was going to place $1,116,627 in escrow to fund environmental remediation (Plaintiff's Exhibit 3 at 2), there is no evidence that these funds have yet been expended. Hammon Plating's claim for an offset of damages due under the Promissory Note for environmental remediation costs is thus premature. However, Hammon Plating's right to offset future environmental remediation expenses that it actually incurs from amounts due under the judgment which will be entered in this matter, or to otherwise affirmatively prosecute its right to reimbursement of remediation expenses, is fully preserved.

33. With regard to post-judgment interest, the parties mutually agreed in the Promissory Note upon a default interest rate of 10% per annum. Defendant's Exhibit "B" at 2, ¶ 6. The agreed-upon interest rate, and not the federal statutory rate, provides the basis for post-judgment interest under this circumstance. *Citicorp Real Estate, Inc. v. Smith*, 155 F.3d 1097, 1107 (9th Cir. 1998) (finding the parties "contractually waived their right to have post-judgment interest

calculated at the federal statutory rate" where the parties mutually agreed on an interest rate in a promissory note).

34.     Based on the foregoing, the Court finds in favor of Wooten on Count Two of her Counterclaim and awards compensatory damages in favor of Wooten and against AMC as follows: (a) in the amount of $4,239,000, representing the principal amount due under the terms of the Promissory Note; (b) in the amount of $872,200, representing accrued interest through the date of September 19, 2017; (c) post-judgment interest on the principal amount of $4,239,000 at the rate of 10% per annum; (d) attorneys' fees in an amount to be set by the Court.

### F.     Wooten's Counterclaim for Breach of the Guaranty

35.     Count Three of Wooten's Counterclaim complains that Esperer Holdings is in default of its obligation to guaranty repayment of all amounts due under the Promissory Note.  *See* ECF No. 17, at 14.  The controlling provisions of ¶ 1 of the Guaranty provide:

> Guarantor hereby unconditionally and irrevocably guarantees to Lender the payment of all sums to be paid by Borrower under or pursuant to the Note, including but not limited to any adjustments in the principal thereof (as set forth in Section 3 of the Note or otherwise, and including any adjustment in amounts due under the Note arising under Section 1.3(d), Section 1.3(f), Section 1.3(g), respectively, of the Stock Purchase Agreement). The guaranty of Guarantor as set forth herein is an absolute, continuing, primary and unconditional guaranty of payment and performance, and not of collection.

36.     The Court reiterates and incorporates by reference its ruling set forth above, in Conclusion of Law Section E, that AMC is in breach of its obligations under the Promissory Note and owes damages as set forth therein.  The Court concludes that under the terms of the Guaranty, Esperer Holdings is also liable jointly and severally with AMC for all principal, interest, and attorneys' fees which are due under the Promissory Note as set forth in Conclusion of Law Section E above.  Esperer Holdings' right to offset future environmental remediation expenses from amounts due under the judgment which will be entered in this matter, or to otherwise affirmatively prosecute claims for reimbursement of such expenses, is fully preserved.

**III.     CONCLUSION**

For the reasons set forth above, the Court finds that Wooten is not liable in Count Three of Hammon Plating's Complaint, which alleges that Wooten breached the implied covenant of good faith and fair dealing.  Further, as set forth on the record during the September 18, 2017 bench trial, the Court granted Wooten's oral motion under Federal Rule of Civil Procedure 52 with regards to Hammon Plating's breach of contract subclaim in Count One relating to the ERISA compliance issues.

With regards to Wooten's Counterclaims, the Court finds in favor of Wooten on all three of Wooten's Counterclaims against Hammon Plating, AMC, and Esperer Holdings. Specifically, the Court finds as follows:

- The Court finds in favor of Wooten on Count One of Wooten's Counterclaims, which is against Hammon Plating and AMC for breach of their monthly payment obligations under the Agreement.  The Court awards compensatory damages in favor of Wooten and against Hammon Plating and AMC jointly and severally in the amount of $1,885,887.35.  Post-judgment interest will also be awarded on this amount pursuant to 28 U.S.C. § 1961(a) at the rate of 1.3% per annum.

- The Court finds in favor of Wooten on Count Two of Wooten's Counterclaims, which is against AMC for breach of the Promissory Note.  The Court awards compensatory damages in favor of Wooten and against AMC as follows: (a) in the amount of $4,239,000, representing the principal amount due under the terms of the Promissory Note; (b) in the amount of $872,200, representing accrued interest through the date of September 19, 2017; (c) post-judgment interest on the principal amount of $4,239,000 at the rate of 10% per annum; (d) attorneys' fees in an amount to be set by the Court

- The Court finds in favor of Wooten on Count Three of Wooten's Counterclaims, which is against Esperer Holdings for breach of the Guaranty.  Accordingly, Esperer Holdings is liable jointly and severally with AMC for all principal, interest, and attorneys' fees which are due under the Promissory Note

Wooten shall submit her application for attorneys' fees on or before October 25, 2017.  Any opposition and reply shall be filed in accordance with the Civil Local Rules.

**IT IS SO ORDERED.**

Dated: September 25, 2017

_Lucy H. Koh_

LUCY H. KOH
United States District Judge